Dennis MAGNOTTA, Petitioner,

v.

Carl BERRY, as superintendent of Woodbourne Correctional Facility and the Attorney General of the State of New York Respondents.

No. 91 Civ. 0531 (DNE).

United States District Court, S.D. New York.

Nov. 9, 1995.

Morosco and Cunard, White Plains, New York (B. Anthony Morosco, of counsel), for petitioner.

Robert M. Morgenthau, District Attorney New York County, New York City (Robert M. Raciti, Laurie Sapakoff, of counsel), for respondents.

## OPINION & ORDER

EDELSTEIN, District Judge:

Petitioner Dennis Magnotta ("petitioner") seeks a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.[1] Petitioner challenges his New York State Supreme Court convictions for four counts of sodomy in the first degree, three counts of rape in the first degree, one count of attempted rape in the first degree, and two counts of robbery in the first degree. Petitioner was sentenced to and is serving concurrent prison terms of six to eighteen years for each of the sodomy and rape counts, nine to eighteen years for the robbery counts, and four to twelve years for the attempted rape count. This Court referred the instant petition to then United States Chief Magistrate Judge Nina Gershon ("Magistrate Judge Gershon") for a Report and Recommendation ("the Report").[2]

---

**1.** 28 U.S.C. § 2254(a) states:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

**2.** Magistrate Judge Gershon's Report and Recommendation is a compilation of two documents: an Order dated March 16, 1992, and a

Report and Recommendation dated December 22, 1993. The March 16, 1992, Order reviewed all of petitioner's claims and found that all of these claims were meritless, except one. With respect to this one claim, the Order stated that this claim could not be decided without an evidentiary hearing. *See* 91 Civ. 531, Order, at 18 (March 16, 1992). The Order states: "A hearing will be scheduled. Upon completion of the hearing a final report and recommendation, which will incorporate this order, will be filed." *Id.* at 19–20.

## BACKGROUND

Petitioner's convictions stem from four alleged separate sexual assaults on prostitutes that occurred between September and October 1983. Petitioner's alleged *modus operandi* during each of these four episodes was largely the same.

The first prostitute, Mary Battle ("Battle"), claimed that in the summer of 1983, petitioner, who was driving a black Lincoln Continental, approached her and offered her $40 in exchange for oral sex. (Tr. 202–05, 213.)[3] Battle agreed and entered petitioner's car, and he gave her the money. (Tr. 202–05.) Battle saw that petitioner had a name plate on the dashboard of his car, bearing the name "Dennis Magnotta." (Tr. 213–14.) After Battle entered the car, petitioner pulled out a knife and a gun and threatened to kill her if she tried to escape. (Tr. 206–08.) Petitioner also ordered Battle to give him back the $40 and give him any other money she had. (Tr. 207.) Battle did as petitioner ordered. (Tr. 207.) Petitioner then drove north on the Westside Highway and continued driving until he reached a parking lot that Battle thought was located in Mount Vernon, New York. (Tr. 209.) Still threatening her with the gun, petitioner forced her to perform oral sex. (Tr. 211.) Next, petitioner ordered Battle out of the car and told her not to attempt to escape. (Tr. 212.) During this time, petitioner threatened Battle with the gun and a blackjack. (Tr. 212.) After exiting the car, however, Battle noticed two pedestrians nearby, and she screamed for help. (Tr. 212.) Petitioner got back into his car and sped off quickly. (Tr. 213.) Battle, who had memorized petitioner's license plate number, called the Mount Vernon police. (Tr. 213.) After the police came, Battle went to the police station and told the police what had happened. (Tr. 216–17.)

The second prostitute, Nancy Brooks ("Brooks"), testified at trial that in late September 1983, petitioner, who was driving a dark blue Lincoln Continental, approached her and offered her $25 in exchange for oral sex. (Tr. 134, 142.) Brooks entered petitioner's car. Petition told Brooks that his name was "Dennis," and Brooks saw a name plate on petitioner's dashboard, which bore the name "Dennis Magnotta." (Tr. 143, 151.) Petitioner then paid Brooks, and Brooks performed oral sex on petitioner. (Tr. 135.) Thereafter, petitioner pulled out a gun and told Brooks not to move. (Tr. 136–38.) Petitioner proceeded to drive north for approximately two hours, and while he was driving, petitioner snorted a white powder. (Tr. 140–41.)

Brooks claimed that petitioner stopped his car in the parking lot of the Quality Inn in Hawthorne, New York, and handcuffed her to the steering wheel. (Tr. 142–44.) Petitioner then returned to the car, took Brooks to a room at the Quality Inn, and proceeded to rape and sodomize Brooks for several hours. (Tr. 140–49.) After spending approximately five hours at the hotel, petitioner took Brooks back to the car and drove back to Manhattan. (Tr. 149–52.) Petitioner then ordered Brooks to give him all of her money. (Tr. 152–54.) Brooks handed petitioner approximately $350, and petitioner returned a small amount of this money to Brooks. (Tr. 152–54.) Petitioner then let Brooks leave the car in Manhattan, and Brooks telephoned the Hawthorne and Poughkeepsie police. (Tr. 155.)

The third prostitute, Michele Slater ("Slater") testified that on October 1, 1983, petitioner, who was driving a black Lincoln Continental, approached her and offered her money in exchange for oral sex. (Tr. 255–57.) As Slater entered petitioner's car, petitioner pushed her inside and pointed a gun at

In accordance with this Order, Magistrate Judge Gershon conducted a hearing on the unresolved claim and filed a Report and Recommendation that incorporates the Order. *See* 91 Civ. 531, Report and Recommendation (December 22, 1993).

Throughout the text of this Opinion and Order, this Court refers to both the March 16, 1992, Order and the December 22, 1993, Report and

and Recommendation as "the Report" because the December 22 Report and Recommendation incorporates the March 16 Order. For purposes of clarity, however, the March 16 Order is cited as "Order" and the Report and Recommendation is cited as "Report."

**3.** Citations to "Tr." refer to citations to the transcript of petitioner's second trial.

her. (Tr. 256–58.) Slater testified that she saw a name plate which bore the name "Dennis Magnotta" inside petitioner's car. (Tr. 264.) After parking at several locations, petitioner drove to a highway in Manhattan and then drove north. (Tr. 259–61.) While driving, petitioner snorted cocaine. (Tr. 262, 265.)

After driving for approximately two hours, petitioner parked the Lincoln outside a hotel, handcuffed Slater to the steering wheel, and entered the hotel. (Tr. 264–65, 271–72.) Slater attempted to blow the car's horn, but the horn did not sound. (Tr. 266.) Thereafter, petitioner returned to the car, and led Slater at gunpoint into a room at the hotel. (Tr. 266–68.) In this room, petitioner opened a briefcase that contained a knife, a rope, some wire, and another gun. (Tr. 270–71.) Petitioner also took out a blackjack and hit Slater with it. (Tr. 271.) In the hotel room, petitioner raped and sodomized Slater. (Tr. 269–73.) After approximately four hours, petitioner and Slater returned to petitioner's car, and he drove to Manhattan, where petitioner released her. (Tr. 271, 273–74.) After going to her home and taking a shower, Slater went to a police precinct on 54th Street, spoke with a police sergeant who had arrested her on several occasions for loitering, and filed a complaint. (Tr. 274–76.)

The fourth prostitute, Patricia Burkett ("Burkett"), testified that on October 2, 1983, petitioner, who was driving a black Lincoln Continental, approached her. (Tr. 47–49, 70.) Burkett asked petitioner if he wanted a date, and he said that he did. (Tr. 48–49.) Burkett entered petitioner's car, and petitioner agreed to pay Burkett $30 for oral sex. (Tr. 49.) Burkett testified that she saw a name plate on petitioner's dashboard, which bore the name "Dennis," although she stated that she could not recall the last name on the name plate. (Tr. 70.) Petitioner then pulled out a gun and pointed the gun at Burkett, warning her not to move or he would shoot her. (Tr. 53–54.) Petitioner then proceeded to drive North on the Westside Highway for approximately two hours, and during this time petitioner snorted a white powder. (Tr. 54–58.) Petitioner stopped near the hotel and put Burkett in the trunk of his car (Tr.

58–59.). After about ten minutes, petitioner removed Burkett from the trunk of his car and handcuffed her to the steering wheel. (Tr. 59.) Petitioner entered the hotel, and he returned shortly and led Burkett into a room at the hotel. (Tr. 59.)

In the hotel room, petitioner repeatedly raped and sodomized Burkett. (61–66.) Burkett observed that petitioner possessed a gun, a switch-blade knife, and a blackjack. (Tr. 64.) Moreover, while in the room, petitioner handcuffed Burkett to the shower, handcuffed her to the bed, struck her with a blackjack, and threatened to kill her. (Tr. 60–62.) Throughout this time, petitioner continued to snort a white powder. (Tr. 65–67.)

After spending approximately an entire day in the hotel room, petitioner and Burkett returned to the car and drove to Manhattan. (Tr. 68–69.) Petitioner then parked the car and forced Burkett to perform oral sex. (Tr. 67–68.) Petitioner then took all of Burkett's money and left her between 95th and 96th Streets. (Tr. 69.) Burkett proceeded to walk to 42nd Street, where she flagged down the patrol car of two police officers she knew. (Tr. 70–71.) The officers spoke with Burkett for several hours and then brought her to a hospital. (Tr. 71, 94, 477.)

On October 11, 1983, Burkett saw petitioner driving a black Lincoln Continental in Manhattan. (Tr. 71–72, 113–114.) Burkett immediately flagged down an unmarked police car and explained to the officers that the man in the black Lincoln had "kidnapped" her. (Tr. 72.)

The police arrested petitioner, and after searching petitioner and his car, they found a gun, a switchblade knife, and a set of handcuffs. (Tr. 513–16, 551–54.) The police also found a name plate bearing the name "Dennis Magnotta" in the passenger compartment of petitioner's car. (Tr. 517.) On October 18, 1983, Nancy Brooks and Michele Slater separately identified petitioner in a lineup. (Tr. 165, 283–89.)

Petitioner largely denied all of the accusations made by the complaining witnesses. Petitioner claimed that he had never raped any woman and that he had never seen

Brooks, Burkett, or Slater until his trial. (Tr. 700–02, 764.) Petitioner stated that he had encountered Battle on one occasion. (Tr. 692.) Petitioner claimed that on the evening of September 19, 1983, he was driving home from a local bar when he saw Battle standing in the middle of the street and attempting to flag him down. (Tr. 692.) Petitioner claimed that Battle was upset and looked as if she had been beaten. (Tr. 692–93.) Petitioner claimed that Battle stated that she had been robbed, and petitioner offered to drive her to a police station. (Tr. 693.) Petitioner contends that Battle entered his car, stated that she was a prostitute, and asked petitioner if he wanted a date. (Tr. 693.) Petitioner asserts that Battle then told him that she was in "big trouble" and that she needed $300. (Tr. 694.) Petitioner pulled over and told Battle to leave the car. (Tr. 694.) Petitioner claims that after Battle exited his car, she became very angry and said, " 'Don't worry I will fix your ass Dennis.' " (Tr. 695.)

Petitioner was brought to trial in New York State Supreme Court. During petitioner's trial, however, prosecutor Margaret Finnerty ("the prosecutor") failed to produce two of the complaining witnesses, Patricia Burkett and Nancy Brooks. (April 3, 1985, Afternoon Tr. 4–5.) The prosecutor stated that she was surprised that these witnesses did not appear, and she asked the court to grant her an adjournment so that she could locate these witnesses and bring them to court. (April 3, 1985, Morning Tr. 338–42.) Defense counsel moved for a mistrial, arguing that because the prosecutor had repeatedly referred to these witnesses in her opening statement his client faced substantial prejudice. (April 3, 1985, Afternoon Tr. 6–7.) Although defense counsel stated that he did not believe that the prosecutor had acted in bad faith, counsel argued that the prosecutor bore the responsibility for the witnesses' failure to appear, particularly because each witness was not under subpoena and had not been served with a material witness order. (April 3, 1985, Afternoon Tr. 15.) The court declared a mistrial. (April 3, 1985, Afternoon Tr. 15–16.)

Thereafter, petitioner was retried and convicted on ten counts. Petitioner appealed his conviction to the Supreme Court Appellate Division, which unanimously affirmed petitioner's conviction without opinion. See People v. Magnotta, 127 A.D.2d 452, 510 N.Y.S.2d 998 (1st Dep't 1987). Petitioner then sought leave to appeal to the New York State Court of Appeals, which denied petitioner leave to appeal. People v. Magnotta, 69 N.Y.2d 883, 507 N.E.2d 1101, 515 N.Y.S.2d 1031 (1987).

Thereafter, petitioner hired a private investigator named Otis Steven Fredricksen ("Investigator Fredricksen"). Investigator Fredricksen interviewed three of the complaining witnesses: Mary Battle, Nancy Brooks, also known as Nancy Rische, and Patricia Burkett, also known as Carol Burkett. Petitioner contends that during these interviews, Brooks and Burkett each made statements that contradicted her trial testimony. Petitioner contends that these statements demonstrate that the prosecutor intended to goad petitioner into seeking a mistrial, suppressed material evidence, suborned perjury, and engaged in serious prosecutorial misconduct. In addition, because police officer Alton McCabe had testified at trial that he was unable to locate certain records from the Elmsford Motel ("the Elmsford"), which was the scene of one of the rapes, Investigator Fredricksen went to the Elmsford Motel to search for these missing records. Petitioner's counsel states that Investigator Fredricksen found the missing records together with a note that stated that the assistant district attorney will "call tonight." (February 28, 1990, Affidavit of B. Anthony Morosco at 4–5.)

Based on this new information, petitioner moved to vacate his convictions, pursuant to Article 440.10 of the New York Criminal Procedure Law. The trial judge denied petitioner's motion, and the Appellate Division denied leave to appeal.

Thereafter, petitioner brought the instant petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. In support of this petition, petitioner submitted the portions of Investigator Fredricksen's interviews that petitioner deemed relevant. This Court re-

ferred the instant petition to then United States Chief Magistrate Judge Nina Gershon for a Report and Recommendation. In an Order dated March 16, 1992, Magistrate Judge Gershon found that all of petitioner's claim were meritless, except one. The Order stated that the merits of this one claim could not be determined without a hearing. Order at 19. In accordance with the Order, Magistrate Judge Gershon conducted a hearing on the one remaining claim. On December 22, 1993, she issued a Report and Recommendation which found that the one remaining claim was meritless and which incorporates the March 16, 1992, Order by reference. Petitioner failed to file timely objections to the Report and Recommendation.

## DISCUSSION

Before proceeding to the substance of petitioner's claims, two issues must be noted. First, all of petitioner's claims are within the scope of 28 U.S.C. § 2254. Petitioner raises a double-jeopardy claim, raises claims that the prosecution failed to provide petitioner with material evidence prior to trial, raises claims that the prosecution knowingly used perjured testimony, and raises a claim that the prosecutor engaged in prosecutorial misconduct. Each of these claims asserts that petitioner's convictions violate the Constitution of the United States, and thus, that he is being held in custody in violation of the Constitution of the United States. *See* 28 U.S.C. § 2254 ("a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States").

■ Second, petitioner has exhausted his state-court remedies. Before bringing a § 2254 petition, a petitioner must exhaust his state-court remedies. *See Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994) ("A federal court may not grant a writ of habeas corpus to a state prisoner 'unless it appears that the applicant had exhausted the remedies available in the courts of the State....' ") (quoting 28 U.S.C. § 2254(b)), *cert. denied,* — U.S. —, 115 S.Ct. 1436, 131 L.Ed.2d 316

(1995); *Daye v. Attorney General,* 696 F.2d 186, 190 (2d Cir.1982) (*en banc*). In the instant case, petitioner contends that he exhausted his state-court remedies; respondents do not challenge petitioner's contention; and Magistrate Judge Gershon's Report found that petitioner exhausted his state-court remedies. After reviewing all of the relevant documents in this case, this Court finds that petitioner exhausted his state-court remedies.

Having disposed of these initial matters, this Court will analyze each of petitioner's claims in turn.

### 1. Double Jeopardy

■ The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution states that "[n]o person shall be ... subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see also Oregon v. Kennedy,* 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982) ("The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense.") (citation omitted). The Due Process Clause of the Fourteenth Amendment extends double-jeopardy protection to a defendant in a state criminal proceeding. *Benton v. Maryland,* 395 U.S. 784, 793–96, 89 S.Ct. 2056, 2062–64, 23 L.Ed.2d 707 (1969). Double-jeopardy protection embodies the fundamental policy " 'that the State with all of its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' " *United States v. Rivera,* 802 F.2d 593, 597 (2d Cir.1986) (quoting *Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957)), *judgment aff'd,* 812 F.2d 713 (2d Cir.1987) (Table). "As a part of this protection against multiple prosecutions, the Double Jeopardy Clause affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal.' " *Kennedy,* 456 U.S. at 671–72,

102 S.Ct. at 2087 (quoting *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)). This right, however, is not absolute. "The Double Jeopardy Clause ... does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal law in one proceeding." *Id.* at 672, 102 S.Ct. at 2087 (citations omitted).

■■ In assessing whether a double-jeopardy violation has occurred, courts distinguish between cases in which a defendant objects to the declaration of mistrial and cases in which a defendant requests the declaration of a mistrial. If a defendant objects to the declaration of a mistrial, the Double Jeopardy Clause bars a retrial unless there is a manifest necessity for declaring a mistrial, "the classic example of which is a hung jury." *Rivera,* 802 F.2d at 597 (citing *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824)). In contrast, a defendant who requests a mistrial is only entitled to double-jeopardy protection if "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Rivera,* 802 F.2d at 598. Although the Double Jeopardy Clause protects "a defendant against governmental actions intended to provoke mistrial requests," *United States v. Dinitz,* 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267 (1976), the mere fact that the Government's actions provide a defendant with the grounds for seeking and receiving a mistrial is insufficient for double-jeopardy protection to attach. *See Kennedy,* 456 U.S. at 675–76, 102 S.Ct. at 2089. Rather, "[o]nly where the government conduct in question *is intended to 'goad' the defendant into moving for a mistrial* may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id.* (emphasis added).

■■ In the instant case, Petitioner contends that his second trial, at which he was convicted, violated his right not to be put in jeopardy twice for the same offense. Although petitioner moved for a mistrial and obtained one at the first trial, petitioner contends that the prosecutor intentionally sought to goad petitioner into seeking this mistrial. Petitioner argues that "the prosecutor misrepresented that two witnesses [Nancy Brooks and Pat Burkett] would appear when in fact they would not and the prosecutor knew or should have known that they were not going to appear." (Petitioner's Memorandum of Law in Support of Petition ("Petitioner's Memo") at 2.) Petitioner contends that the prosecutor sought a mistrial in order "to obtain a new start of trial that was going poorly, and to obtain a more favorable trial judge in the retrial of the matter." *Id.* at 2.

Petitioner asserts that several facts demonstrate that the prosecutor knew that these witnesses would not appear. First, petitioner argues that, despite the prosecutor's statement that these witnesses had indicated that they would appear, the prosecutor knew that Nancy Brooks did not intend to appear at the trial. (Petitioner's Petition [for a writ of habeas corpus] ("Petition") at 5 ("Nancy Brooks told Investigator Fredricksen ... that she told the prosecutor she would not testify.").) Second, petitioner contends that Brooks was not aware that the first trial had been scheduled at all. *Id.* at 6 ("Nancy Brooks also indicated in her interview with Investigator Fredricksen that she did not know when the first trial was to take place....."). Third, petitioner asserts the prosecutor misrepresented to the Court that Brooks had never missed a previous appointment. *Id.* at 7. Petitioner asserts that "Brooks told [Investigator] Fredricksen that she had often failed to keep her appointments with the district attorney's office." *Id.* at 7 (citation omitted). Fourth, petitioner notes that neither Brooks nor Burkett was served with either a subpoena or a material witness order. *Id.* at 4–5.

The Report rejected petitioner's double-jeopardy claim, stating that "[t]he record before this court does not provide any evidence that the prosecutor intentionally provoked the defendant into requesting a mistrial." Order at 9. The Report found that "[t]he investigator's interviews with the witnesses, assuming them to be accurate, do not contradict the prosecutor's representations that she believed the witnesses would appear." *Id.* The Report noted that the pros-

ecutor stated that Burkett and Brooks "had confirmed that they would testify only one week before the trial" and that "Brooks had never failed to appear for a scheduled appointment or proceeding." Order at 9. Magistrate Judge Gershon concluded that "the facts presented here do not support a conclusion that the prosecutor acted in bad faith with intent to provoke a mistrial." *Id.* at 10.

After reviewing the trial transcript and the transcripts of Investigator Fredricksen's interviews, this Court finds that the Report's double-jeopardy finding is neither clearly erroneous nor contrary to law.[4] *See* 28 U.S.C. § 636(b)(1) (district court will uphold a magistrate's report and recommendation unless it is clearly erroneous or contrary to law).

None of petitioner's four arguments demonstrates that the prosecutor sought to goad petitioner into seeking a mistrial. First, petitioner's contention that "Nancy Brooks told Investigator Fredricksen ... that she told the prosecutor she would not testify," (Petition at 5), is not supported by the evidence. Although the transcript of Brooks's interview with Investigator Fredricksen establishes that Brooks did not intend to appear at the first trial, it does not indicate that the prosecutor was aware of Brooks's intention. On the contrary, in the interview, Brooks states that, during a conversation with the prosecutor, Brooks agreed to testify, despite the fact that Brooks had no intention of fulfilling this agreement. (December 10, 1987, Fredricksen Interview with Rische[5] at 19 (Brooks states: "Like I told you, I don't I never paid any mind she'd tell me to come in there down there so and so morning at nine o'clock and I'd yeah ok ok....").).

Petitioner's contention that Brooks told the prosecutor that Brooks would not testify is a conclusion drawn from an extremely selective reading of the transcript of Investigator Fredricksen's interview with Brooks. In support of his contention, petitioner cites a portion of interview between Brooks and Investigator Fredricksen. (Petitioner at 5.) However, a review of this portion of the transcript demonstrates that petitioner has taken Brooks's remark out of context and that petitioner's claim is meritless:

[Q]: Did you tell them you wouldn't testify[?]

[A]: Yes I did. They use to call me at my other number where, the number that they had the first time[.]

[Q]: Um hmm[.]

[A] and I told them I didn't want to be bothered, to leave me alone and they continued and she pushed it, came to my job and got me[.]

[Q] No, no what I'm what I'm asking you is the first trial.

*Id.* at 5–6. Thus, although petitioner argues that Brooks answered "yes" when Investigator Fredricksen asked her "[d]id you tell them you wouldn't testify[?]," when this passage is read in context, it is abundantly clear that Brooks is stating that she would not appear at the second trial, not the first. Therefore, petitioner's claim is without merit.

Second, petitioner wrongly asserts that "Nancy Brooks ... indicated in her interview with investigator Fredricksen that she did not know when the first trial was to take place." (Petition at 6.) In fact, during her interview with Investigator Fredricksen, Brooks stated alternatively that she did not remember whether the prosecutor had told her about the first trial, that the prosecutor had not told her about the first trial, and that the prosecutor had told her about the first trial. (December 10, 1987, Fredricksen Interview with Rische at 7 (when Investigator Fredricksen asked Brooks, "[d]id they tell you there was a trial going on," Brooks stated, "I don't remember")); *id.* at 12 (when

---

4. Indeed, this Court would uphold the Report's double-jeopardy finding even if the more stringent *de novo* standard of review applied in the instant case. *See* 28 U.S.C. § 636(b)(1) (if a party files an objection to a magistrate's report and recommendation, "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made").

5. Although the transcript of the interview names the interviewee as "Rische," Investigator's Fredricksen's affidavit states that Nancy Brooks used the alias Nancy Rische. (February 23, 1990, Affidavit of Otis Steven Fredricksen at 2.)

Investigator Fredricksen asked Brooks, "did you know there was a trial going on the first time," Brooks stated "I don't I didn't know anything"); *id.* (in a colloquy with Investigator Fredricksen about whether the prosecution told Brooks about the first trial, Brooks stated, "[t]hey told me, they told me that that was happening yeah"). Brooks's entirely contradictory statements regarding this matter—which include a statement that the prosecutor told Brooks about the first trial—do not establish that the prosecutor failed to inform Brooks about the first trial as part of an attempt to goad petitioner into moving for a new trial.

Third, petitioner contends that, contrary to the prosecutor's assertion that Brooks had never missed an appointment, "Brooks told [Investigator] Fredricksen that she had often failed to keep her appointments with the district attorney's office." *Id.* at 7 (citation omitted). Although Brooks stated in her interview with Fredricksen that she repeatedly missed appointments with the prosecutor, Brooks's statement fails to distinguish between the first and second trials. Despite Brooks's vagueness, however, Brooks's interview testimony does not contradict the prosecutor's assertion at the first trial. At the first trial, the prosecutor represented to the Court that she had met with Brooks on two occasions. (April 3, 1985, Afternoon Tr. at 6.) Although Brooks stated that her recollection was faulty, Brooks indicated during her interview with Investigator Fredricksen that she had met with the prosecutor twice, prior to the first trial. ((December 10, 1987, Fredricksen Interview with Rische at 19.) ("I don't remember when I met her. I don't remember.... I met with her I think twice maybe even once."). Moreover, the prosecutor represented to the Court that Brooks had appeared before the Grand Jury, and had appeared for petitioner's line-up. (April 3, 1985, Morning Tr. 341.) Petitioner's counsel at the first trial did not object to this representation; Brooks's interview testimony does not cast doubt on this representation; and petitioner has not challenged this representation in the instant petition. Thus, petitioner's claim that Brooks missed appointments in the past is solely based on Brooks's nebulous interview testimony, which does not distinguish between the first and second trials, which fails to mention any specific instance when Brooks failed to appear prior to the first trial, and which fails to contradict any of the representations that the prosecutor made at the first trial.

Fourth, petitioner asserts that neither Brooks nor Burkett was served with either a subpoena or a material witness order to appear at the first trial. (Petition at 4–5.) Although the prosecutor's failure to serve each witness with a subpoena or a material witness order was careless, it does not demonstrate that the prosecutor acted in bad faith to procure a mistrial. In fact, Brooks was subpoenaed to appear at the first trial, but the trial was postponed and prosecutor failed to subpoena Brooks to appear for the rescheduled date. (April 3, 1985, Morning at 340–41.) While petitioner has demonstrated that the prosecutor erred in failing to subpoena two witnesses, petitioner has not demonstrated that the prosecutor acted in bad faith.

Petitioner's assertion that the prosecutor sought to goad petitioner into seeking a mistrial is based only on speculation. As previously noted, "[o]nly where the government conduct in question *is intended to 'goad' the defendant into moving for a mistrial* may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Kennedy,* 456 U.S. at 675–76, 102 S.Ct. at 2089 (emphasis added). In the instant case, petitioner has merely speculated that the prosecutor sought a mistrial in order "to obtain a new start of a trial that was going poorly, and to obtain a more favorable trial judge in the retrial of the matter." (Petitioner's Memo at 2.) Petitioner has produced no evidence to support this speculation, and petitioner has not even attempted to explain why the "trial was going poorly" or why the prosecutor might not view the first trial judge as "favorable." In fact, petitioner all but concedes that he is merely speculating that the prosecutor sought a new trial in order to obtain a favorable judge: "it may reasonably *be assumed* that the prosecutor in this case recognized that the chance for con-

viction was greater before a Judge other than [the judge at the first trial]." (Reply Memorandum of Petitioner at 3 (emphasis added).) Petitioner's assumptions are no substitute for evidence.

Petitioner's argument is further undermined by a statement that petitioner's counsel at the first trial made moments before the court declared a mistrial. At that time, petitioner's trial counsel stated: "I might just add, your Honor, that ... I have no problem with [the prosecutor].... I think she is a person of very high ethical standards." (April 3, 1985, Afternoon Tr. at 7.) Thus, petitioner's own trial counsel represented to the court that he did not believe that the prosecutor had acted improperly.

As the foregoing discussion demonstrates, petitioner has failed to show that the prosecution intended to goad the defendant into moving for a mistrial at the first trial. Petitioner's arguments to the contrary are based on a flawed reading of the transcripts of Investigator Fredricksen's interviews and on petitioner's own speculation regarding the prosecutor's motives. This Court finds that Magistrate Judge Gershon's Report correctly rejected petitioner's double-jeopardy argument. Therefore, this Court holds that petitioner is not entitled to § 2254 relief on double-jeopardy grounds.

### 2. Alleged Brady Violations

■ In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Under the Due Process Clause of the Fourteenth Amendment, state prosecutors are subject to the *Brady* rule. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).

■ In the years since the Court decided *Brady,* the *Brady* rule has expanded. Although *Brady* only addressed a prosecutor's duty to disclose exculpatory evidence, "[i]mpeachment evidence ... as well as ex-

culpatory evidence, falls within the *Brady* rule." *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) (citing *Giglio v. United States* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972)). Moreover, *Brady* now extends to cases in which a defendant makes no request that the prosecutor disclose material evidence. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3384.

■ Under *Brady,* a defendant's due process rights are only violated if the prosecutor fails to turn over "material" evidence. *United States v. Gambino,* 59 F.3d 353, 365 (2d Cir.1995) ("information not disclosed to the defense creates constitutional error ... only when that information is material"); *United States v. Gaggi,* 811 F.2d 47, 59 (2d Cir.), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383; *see also Gambino,* 59 F.3d at 365 (2d Cir.1995) (citation omitted). "To determine whether a defendant was deprived of his due process right to a fair trial, the court must evaluate the omission in the light of the entire record: 'If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.'" *Gambino,* 59 F.3d at 365 (quoting *Agurs,* 427 U.S. at 112–13, 96 S.Ct. at 2402).

■ Although *Brady* requires a prosecutor to turn over material evidence to a defendant, "'the prosecutor is not required to deliver his entire file to defense counsel.'" *United States v. Gaggi,* 811 F.2d 47, 59 (2d Cir.1987) (quoting *Bagley,* 473 U.S. at 675, 105 S.Ct. at 3380). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Agurs,* 427 U.S. at 109–10, 96 S.Ct. at 2400; *see also United States v. LeRoy,* 687 F.2d 610, 619 (2d Cir.1982) ("The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably

assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government.") (citation omitted), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

Petitioner contends that his convictions violate the Constitution of the United States because the prosecutor suppressed several pieces of material evidence. First, petitioner contends that the prosecutor failed to disclose the fact that Pat Burkett could not read. (Petition at 11.) Petitioner contends that this evidence was material because Burkett testified at trial that she read the name "Dennis Magnotta" on the plaque in petitioner's car and that she read the name of the Elmsford Motel, which was the scene of one of the rapes. (Petition at 12.)

Second, petitioner contends that the prosecutor failed to disclose the fact that Nancy Brooks told Pat Burkett that Brooks intended to testify falsely that petitioner had beaten Brooks, when in fact Brooks had been beaten by Brooks's pimp. (Petition at 15.) Although petitioner concedes that Brooks never gave such false testimony, petitioner asserts that Brooks's expressed willingness to testify falsely was material evidence regarding Brooks's credibility. (Petition at 15–16.)

Third, petitioner contends that the prosecutor suppressed records from the Elmsford Motel. (Petition at 9–11.) Petitioner alleges that one of the Government's witnesses, police officer Alton McCabe, went to the Elmsford to search for records that might indicate whether petitioner had stayed at the Motel on the night of Burkett's rape. (Petition at 9.) Petitioner asserts that McCabe testified that McCabe could not locate these records because these records were kept in the basement of the Elmsford, and the basement was flooded. (Petition at 9.) Petitioner contends that Investigator Fredricksen found the relevant records and that "[t]he District Attorney certainly was aware of the existence of those records because a note was attached to the records with Assistant District Attorney Margaret Finnerty's telephone number on it

with a note stating " 'will call you tonight.' " (Petition at 9.) Petitioner asserts that these records are exculpatory evidence because they do not indicate that petitioner "ever registered at the motel on [the date of the rape] or any other date in the month [in which Burkett's rape occurred]." *Id.* at 10.

The Report rejects each of these claims. First, Magistrate Judge Gershon pointed out that petitioner incorrectly asserted that Burkett claimed to have read "Dennis Magnotta" and "the Elmsford Motel." Order at 12. Rather, Burkett merely claimed to have read the name "Dennis" on petitioner's name plate. *Id.* Because Burkett told Investigator Fredricksen that she could read things that she sees every day, the Report concluded that "Burkett's reading ability is a matter of degree." *Id.* In light of the fact that Burkett only claimed to have read one word, the Report found that the prosecutor had not violated *Brady* by failing to disclose Burkett's reading difficulties. Second, the Report found that the prosecutor had not violated *Brady* by failing to disclose the fact that Burkett claimed that Brooks stated that Brooks intended to testify falsely that petitioner had beaten her up. *Id.* at 18. The Report concluded that this evidence was not material, and therefore, the prosecutor had no duty to disclose it. *Id.* Third, the Report concluded that the prosecutor did not violate *Brady* by failing to turn over certain records from the Elmsford Motel because the prosecutor was unaware of the existence of these records and because these records were not material. Report 4–8.

After reviewing the transcripts of the trial, Investigator Fredricksen's interviews, and the hearing held by Magistrate Judge Gershon, this Court finds that the Report's *Brady* findings are neither clearly erroneous nor contrary to law.[6] *See* 28 U.S.C. § 636(b)(1). Each of petitioner's three, *Brady* arguments is examined in turn.

■ First, the fact that Pat Burkett had difficulty reading was not material evidence which must be disclosed under *Brady*. As previously noted, "evidence is material only if

---

**6.** This Court would uphold the Report's *Brady* findings even if the more stringent *de novo* standard of review applied in the instant case. *See* 28 U.S.C. § 636(b)(1).

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; *see also Gambino*, 59 F.3d at 365 (citations omitted). To determine whether evidence is material, this Court evaluates the alleged "omission in the light of the entire record." *Gambino*, 59 F.3d at 365. In the instant case, there is no reasonable probability that the outcome of petitioner's trial would have been different if the prosecution had informed defense counsel that Burkett had a reading problem. Throughout Burkett's testimony, she only claimed to have read one word—the name "Dennis" on petitioner's name plate. A review of Burkett's trial testimony demonstrates that petitioner incorrectly claims that Burkett testified that she read "Magnotta" and "the Elmsford Motel," and petitioner has not cited any section of Burkett's testimony in support of his claim.

In view of Burkett's statement to Investigator Fredricksen that she can read things that she sees every day, this Court agrees with Magistrate Judge Gershon that "Burkett's reading ability is a matter of degree." Order at 12. Thus, even if defense counsel had known that Burkett had trouble reading, counsel could not have used this knowledge effectively to impeach a witness with limited reading ability who only claimed to have read one six-letter word.

Moreover, even if counsel could have demonstrated that Burkett did not read petitioner's name, such a demonstration would not create any reasonable probability that the result of the trial would have been different. *Gambino*, 59 F.3d at 365 ("information not disclosed to the defense creates constitutional error ... only when that information is material"); *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 ("evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"). At the second trial, the prosecution produced an overwhelming quantity of evidence of petitioner's guilt. Each of the four complaining witnesses testified: (1) she was sexually assaulted by a man driving a dark colored Lincoln Continental; (2) the man of-

fered her money for sex, picked her up in Manhattan, and drove north for an extended period of time; (3) the man had a gun and threatened her with it; and (4) the man's car had a name-plate with the name "Dennis" on it. Three witnesses testified that the man snorted a white powder, threatened her with a knife and a blackjack, and possessed and used a set of handcuffs during the sexual assaults. Three witnesses also testified that the name plate contained petitioner's full name, "Dennis Magnotta." Moreover, the testimony of each of these witnesses was corroborated by the fact that when the police arrested petitioner, he was carrying a knife and driving a black Lincoln Continental which had a gun and set of handcuffs in the trunk and which contained a name-plate with the name "Dennis Magnotta" written on it. In addition, Brooks and Slater separately identified petitioner in a lineup, and each of the four witnesses identified petitioner as the man who sexually assaulted her. (Tr. 60, 138, 209, 263.) In view of this powerful evidence, defense counsel could not conjure a reasonable doubt as to petitioner's guilt merely by demonstrating that Burkett may have been unable to read the name "Dennis" on the name plate.

Although this Court recognizes that knowledge of Burkett's reading difficulties might have aided defense counsel, "[t]he mere possibility that an item of undisclosed information might have helped the defense ... does not establish 'materiality' in the constitutional sense." *Agurs*, 427 U.S. at 109–10, 96 S.Ct. at 2400. Therefore, this Court finds that the Report correctly concluded that petitioner's argument was meritless.

■ Second, Brooks's statement that she intended to testify falsely that petitioner had beaten her was not material to petitioner's guilt. As Magistrate Judge Gershon recognized, Brooks never gave this false testimony, but rather, Burkett claimed that Brooks stated that Brooks intended to testify falsely. Order at 17. Nonetheless, petitioner contends that Brooks's stated intention to lie was material impeachment evidence that falls within the *Brady* rule. (Petition at 16–17.)

Although *Brady* extends to material impeachment evidence, *Bagley*, 473 U.S. at 675,

105 S.Ct. at 3380, Brooks's statement is not material evidence because there is no reasonable probability that the outcome of the trial would have been different if the defense had known of the evidence. *See Gambino,* 59 F.3d at 365; *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. As previously discussed, the prosecution produced a substantial quantity of evidence against petitioner. Thus, the mere fact that one witness had considered falsely accusing petitioner of beating her, and then chose not to testify falsely, would not have created a reasonable probability that the outcome of the trial would have been different. Further, because Brooks testified that she was a prostitute, the jury may have questioned her honesty and doubted her testimony. Thus, it is unreasonable to conclude that jury's opinion of Ms. Brooks—and, indeed, its conclusion that petitioner was guilty—would have suffered a sea change if the jury had only heard that Burkett claimed that Brooks had once stated that Brooks intended to testify falsely. Therefore, petitioner's claim is meritless.

■■■ Third, Petitioner's claim that the prosecutor violated *Brady* by failing to turn over records from the Elmsford Motel is meritless because petitioner has failed to demonstrate that the prosecutor knew of the existence of these records and because these records were not material evidence. As the Report notes, there were two types of relevant records from the Elmsford: sign-in records that were filled out by guests, and summaries of the sign-in records that were written by Elmsford employees. Report at 3–4. Petitioner obviously has failed to state a *Brady* claim regarding the employee-written summaries because these records were handed over to the defense. *Id.* at 3–4. Indeed, not only did defense counsel possess these records, but counsel and the prosecutor stipulated that "there is no record of a Dennis Magnotta or Magnotta registering [at the Elmsford Motel]." (Tr. at 883–84.)

Further, petitioner has failed to show that the prosecutor knew of the existence of the sign-in records. The only evidence that petitioner points to in support of his claim that the prosecutor was aware of the existence of the sign-in records is a hand-written note

that was discovered with these records, which states that the prosecutor "will call tonight." Although this note demonstrates that at least one Elmsford employee was aware that the prosecutor was looking for these records, this note does not demonstrate that the prosecutor knew of the existence of the sign-in sheets.

In addition, after conducting a hearing to determine whether the prosecutor suppressed the sign-in records, Magistrate Judge Gershon concluded that the prosecutor had not. Report at 5–7. Magistrate Judge Gershon observed that the prosecutor's hearing testimony that she was unaware of the existence of these records was "straightforward and thoroughly credible." Report at 5.

Further, as the Report correctly asserts, petitioner has failed to establish a *Brady* violation because the Elmsford sign-in sheets are not material evidence. There is no reasonable probability that these records would have changed the outcome of petitioner's trial. *See Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. As previously discussed, the prosecutor and defense counsel stipulated that "there is no record of a Dennis Magnotta or Magnotta registering [at the Elmsford Motel]." (Tr. at 883–84.) Thus, the sign-in sheets—which do not contain any record that petitioner registered at the Elmsford—only establish a fact to which the prosecution had stipulated at trial. Therefore, far from creating a reasonable probability that the outcome of the trial would have been different, there is no possibility that the outcome of the trial would have been different if the defense had obtained these records.

Accordingly, this Court holds that petitioner is not entitled to § 2254 relief on ground that the prosecutor failed to hand over *Brady* material.

### 3. *Prosecution's Alleged Use of Perjured Testimony*

■■■ In addition to a prosecutor's duty to disclose material evidence that is favorable to a defendant, a prosecutor "has a duty to refrain from eliciting and relying upon testimony known to be perjurious." *Gaggi,* 811 F.2d at 59 (citing *Mooney v. Holohan,* 294

U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935) (*per curiam*)). "[T]o challenge a conviction because of a prosecutor's knowing use of false testimony, a defendant must establish that (1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Helmsley*, 985 F.2d 1202, 1205–06 (2d Cir.1993) (quoting *United States v. Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397); *see also United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991) (citations omitted). This standard has been liberally interpreted in favor of defendants, and thus "if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *Wallach*, 935 F.2d at 456 (quoting *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975)).

■ If the prosecutor introduced perjured testimony without knowing that the testimony was perjurious, a different standard applies. "Where the government was unaware of a witness' perjury … a new trial is warranted only if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Wallach*, 935 F.2d at 456 (quoting *Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir.1988) (bracket in *Wallach*).

Petitioner contends that his convictions violate due process because the prosecutor knowingly used several pieces of false testimony. First, petitioner contends that Officer McCabe committed perjury when he stated that he did not find the sign-in sheets at the Elmsford Motel. (Petitioner at 9–10.) Petitioner contends that both Officer McCabe and the prosecutor knew of the existence of these records. (Petition at 9.) Second, petitioner contends that despite the fact that the prosecutor knew that Burkett could not read, the prosecutor did not correct Burkett's testimony on cross-examination that Burkett could read. (Petition at 12.) Petitioner contends that this failure constitutes a knowing use of perjured testimony. *Id.* Third, petitioner contends that the prosecutor intention-

ally elicited false testimony from Patricia Burkett that petitioner had ties with the Mafia. *See id.* at 15. Fourth, petitioner claims that the prosecutor knowingly elicited perjured testimony that Nancy Brooks and Patricia Burkett did not know each other, when in fact, Brooks and Burkett knew each other. *Id.* at 16.

The Report rejects each of petitioner's four claims. First, the Report finds that "there is no inconsistency between Officer McCabe's testimony at trial and [Investigator Fredricksen's] report that would indicate that Officer McCabe gave perjured testimony regarding the condition of the records [at the Elmsford Motel] or his knowledge of their contents." Order at 19. Further, as discussed above, Magistrate Judge Gershon conducted a hearing to determine whether the prosecutor was aware of the existence of these records. Based on the testimony at the hearing, Magistrate Judge Gershon concluded that, during the second trial, the prosecutor was unaware of the existence of these records. Report at 5–7.

Second, the Report finds that the prosecutor had no duty to correct Patricia Burkett's testimony that Burkett could read. Order at 13. The Report emphasized that although Burkett told Investigator Fredricksen that she could not read, Burkett also stated that she could read things that she saw every day. Order at 12. Thus, Magistrate Judge Gershon found that "[i]t is clear that Burkett's reading ability is a matter of degree." *Id.* Therefore, the Report rejected petitioner's claim because "Burkett did not in the interviews in any way suggest that the testimony as to her ability to read the name 'Dennis' was false." *Id.* at 12–13.

Third, the Report rejected petitioner's claim that Burkett committed perjury when she testified that two police officers approached her and warned her not to testify because petitioner had ties with the Mafia. In fact, the Report quoted statements that Burkett made during her interview with Investigator Fredricksen that were consistent with her testimony at trial:

> Investigator: Alright, before the trial did you tell [the prosecutor] about the two

police officers that approached you on the street[.]

Burkett: Yeah[.]

Investigator: And told you that Magnotta was with the Mafia and you better ah not testify you might be killed.

Burkett: Hm hmm[.]

Order at 14 (quoting February 12, 1988, Fredricksen Interview with Burkett at 37). Although petitioner claimed that Burkett committed perjury because petitioner did not have ties with the Mafia, the Report noted that Burkett merely had stated that she feared testifying because two police officers had told her that petitioner had ties to the Mafia; Burkett did not testify that petitioner, in fact, had such ties. Accordingly, the Report concluded: "there is no evidence that the witness's testimony was false: her statements in the interview confirm her testimony at trial that she was afraid because she thought the petitioner was connected to the mafia." Order at 15.

Fourth, the Report rejects petitioner's claim that the prosecution knowingly elicited perjured testimony that Brooks and Burkett did not know each other. The Report notes that, contrary to petitioner's assertion, both Brooks and Burkett testified that they knew each other. Order at 13. The Report recognizes, however, that Burkett's interview statements were inconsistent with her trial testimony. *Id.* At trial, Burkett stated that "she knew Nancy Brooks because they stayed at the same hotel but they did not have any kind of relationship or friendship." *Id.* (citing Tr. at 110–11). In her interview with Investigator Fredricksen, however, Burkett stated that the prosecutor knew that Burkett and Brooks " 'knew each other real well.' " Order at 13 (quoting February 4, 1988, Fredricksen interview with Burkett at 69). The Report also notes that Burkett claimed that "she never stayed at the same hotel as Brooks." *Id.* (citing February 4, 1988, Fredricksen interview with Burkett at 69). Despite this inconsistency, the Report rejects petitioner's claim because the mere fact that Burkett made statements that were inconsistent with her trial testimony did "not

establish the knowing use of perjured testimony." *Id.* at 14.

▇▇▇ After reviewing the record, this Court finds that each of the Report's findings regarding the perjury issues is neither clearly erroneous nor contrary to law.[7] *See* 28 U.S.C. § 636(b)(1). First, the Report correctly rejects petitioner's contention that Officer McCabe committed perjury when he testified that he could not find the sign-in sheets from the Elmsford Motel. As previously noted, "to challenge a conviction because of a prosecutor's knowing use of false testimony, a defendant must establish that ... there was false testimony." *Helmsley,* 985 F.2d at 1205. In the instant case, petitioner points to no evidence that indicates that Officer McCabe testified falsely. Officer McCabe stated that he was unable to find these records, which were stored in the flooded basement of the Elmsford Motel. Officer McCabe made no statement that these records did not exist. Instead, he simply stated that he could not find these records, and petitioner has not produced any evidence that indicates that Officer McCabe found the records.

Petitioner attempts to substantiate his claim that Officer McCabe committed perjury by arguing that the prosecutor knew of the existence of these records. Petitioner then imputes this knowledge to Officer McCabe. Petitioner bases his claim that the prosecutor knew of the existence of the sign-in sheets on the fact that a handwritten note was found with these sheets that states that the prosecutor "will call tonight."

As discussed above, however, although this handwritten note indicates that an Elmsford employee knew that the prosecutor was looking for these records, it does not indicate that the prosecutor knew of the existence of these records. Further, Magistrate Judge Gershon conducted a hearing to determine whether the prosecutor knew about these records prior to trial and concluded that the prosecutor did not. In addition, petitioner entirely has failed to explain why this Court should assume that Officer McCabe knew of

---

**7.** Once again, this Court would uphold the Report's findings even if the more stringent *de novo* standard of review applied in the instant case. *See* 28 U.S.C. § 636(b)(1).

any alleged conversations between the prosecutor and Elmsford employees.

■ Second, the Report correctly concluded that the prosecutor had no duty to correct Patricia Burkett's testimony that she could read. Once again, petitioner has accused a witness of perjury but failed to demonstrate that the witness testified falsely. *See Helmsley,* 985 F.2d at 1205. This Court agrees with Magistrate Judge Gershon's reasoning that Burkett's statement that she can read things that she sees every day demonstrates "that Burkett's reading ability is a matter of degree." Order at 12. Given Burkett's statement that she has a limited reading ability, there is no evidence that Burkett committed perjury when she testified on direct examination that she read the name "Dennis." Likewise, in light of the fact that Burkett only testified that she had read the name "Dennis," petitioner has not established that she committed perjury when she stated on cross-examination that she could read. Because Burkett only claimed to have read one word, the scope of the cross-examination was limited to whether Burkett had the ability to read that word. Therefore, the Report correctly rejected petitioner's claim because "Burkett did not in the interviews in any way suggest that the testimony as to her ability to read the name 'Dennis' was false." *Id.* at 12–13.

■ Third, petitioner also failed to produce any evidence that Burkett committed perjury when she stated that she feared testifying after two police officers had warned her not to testify because petitioner had ties with the Mafia. Petitioner's perjury argument is based on the erroneous reasoning that Burkett must have lied because petitioner has no ties with the Mafia. This argument is flawed because Burkett never testified that petitioner had Mafia ties. Instead, she testified that she *was told* that petitioner had Mafia ties. Not only has petitioner failed to present even a scintilla of evidence that Burkett's statement is false, but her interview statements are entirely consistent with her trial testimony. (February 12, 1988, Fredricksen interview with Burkett at 36.)

Although petitioner attempts to support his argument by pointing to the fact that Burkett told Investigator Fredricksen that the prosecutor said that "it [is] a bunch of bullshit" and "he [isn't] with the Mafia," (Petition at 14), once again petitioner's argument misses the mark. The prosecutor's alleged statements that petitioner did not have Mafia ties in no way demonstrate that Burkett testified falsely regarding the police officers and their warning. Burkett did not testify that petitioner had Mafia ties. Rather, she testified that two police officers said that petitioner had Mafia ties, and petitioner does not challenge this testimony.

Petitioner also has failed to satisfy the second part of the rule in *Helmsley* because he has not shown that "the Government knew or should have known that the testimony was false." *Helmsley,* 985 F.2d at 1205. Even if Burkett were lying when she stated that two police officers had told her that petitioner had Mafia ties—and, as previously discussed, the record is devoid of evidence that indicates that Burkett was lying—petitioner has utterly failed to show that the prosecutor knew that Burkett was lying. On the contrary, Burkett told Investigator Fredricksen that she told the prosecutor that two police officers had approached her on the street and that these officers had told her that petitioner had Mafia ties. (February 12, 1988, Fredricksen interview with Burkett at 36.) Thus, petitioner has failed to produce any evidence that shows that the prosecutor knew that Burkett's testimony was false.

Moreover, if this Court were to assume *arguendo* that Burkett's testimony on this matter were false, petitioner's claim would, nonetheless, be meritless. Because petitioner has failed to show that the prosecutor knew that the testimony was false, petitioner would only be entitled to a new trial if the false testimony is "material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Wallach,* 935 F.2d at 456 (quoting *Sanders,* 863 F.2d at 226) (brackets in *Wallach*). In the instant case, far from having a "firm belief," this Court believes that it savages credulity to think that petitioner would not have been convicted but for this allegedly perjurious testimony. As previously discussed, the

prosecution presented an Everest of evidence that implicated petitioner. This Court believes that even if the jury had not heard this allegedly perjured testimony, petitioner certainly would have been convicted.

This belief is buttressed by the fact that the trial judge ruled that Burkett's testimony should not have been admitted because it was prejudicial, and the trial judge read the following curative instruction to the jury:

> Ladies and gentlemen, I ask you to disregard a prior answer of Miss Burkett. I still want you do disregard it because it's inappropriate.... I know how difficult it is however to disregard something you have already heard, so I do want to tell you that I have inquired into the matter and I want to tell you that the DA's office has stated they have conducted a thorough investigation of this defendant and absolutely no evidence whatever of any kind indicates any ties of this defendant to any criminal activity.

(Tr. 122–23.) In view of this thorough and powerful curative instruction, it is very unlikely that the jury's decision to convict petitioner was based on Burkett's allegedly false testimony. However, regardless of whether the jury improperly considered this testimony, the prosecution's case was extremely strong, and there is no reasonable probability that the jury would not have convicted petitioner in the absence of this testimony.

■ Fourth, the Report correctly rejects petitioner's claim that the prosecution knowingly elicited perjured testimony that Brooks and Burkett did not know each other. Petitioner is simply incorrect in asserting that Brooks and Burkett testified that they did not know each other. In his petition, petitioner states "Burkett and Brooks knew one another despite their claim that they did not which was made on the record." (Petition at 16.) In his memorandum of law, petitioner contends that the prosecution improperly "presented" Burkett as a witness who did not know Brooks. (Petitioner's Memo at 8.) Petitioner and his counsel make these representations without citing the trial transcript. This failure to cite the transcript is hardly surprising, however, because the testimony at trial flatly contradicts petitioner's conten-

tion. At trial, Brooks testified on direct examination that she knew Burkett:

> Q: Now Miss Brooks, do you know a woman named Patricia Burkett?
>
> A: Yes.
>
> Q: And how do you this woman?
>
> A: For spending the last four days in jail with her.
>
> Q: Do you know her from before that time?
>
> A: I met her one other time before.

(Tr. at 158). Similarly, Burkett testified on direct examination that she knew Brooks:

> Q: All right, do you know a woman named Nancy Brooks?
>
> A: Yes.
>
> Q: And can you tell us how you know this person and when you first met her?
>
> A: She stayed at the same hotel I stayed at.
>
> Q: All right, and can you tell us if you have any kind of relationship or friendship with her?
>
> A: No.

(Tr. at 110–11.) Therefore, petitioner's contention that Brooks and Burkett falsely testified that they did not know each other is patently meritless.

The Report also concluded that even if petitioner's claim were interpreted as a claim that Burkett testified falsely about how well she knew Brooks, petitioner's claim is meritless. Magistrate Judge Gershon noted that Burkett's statements to Investigator Fredricksen were "somewhat different" from her trial testimony. Order at 13. The Report concluded, however, that these inconsistencies did not establish that the prosecutor knowingly elicited perjured testimony, particularly because the prosecutor elicited testimony at trial that the witnesses knew each other. Order at 13–14.

As an initial matter, this Court holds that petitioner is not entitled to § 2254 relief on the ground that Burkett's interview statements allegedly are inconsistent with her trial testimony because petitioner has not raised this claim. Although Magistrate Judge Gershon generously interpreted petitioner's papers to raise the claim that Burk-

ett's inconsistent testimony entitles petitioner to § 2254 relief, petitioner and his counsel simply did not raise this claim. Rather, they raised the entirely spurious claim that the prosecution knowingly used false testimony that Brooks and Burkett did not know each other. Although this Court liberally construes papers submitted by *pro se* litigants and will interpret such papers to raise the strongest possible argument, *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (citing *Mikinberg v. Baltic S.S. Co.,* 988 F.2d 327, 330 (2d Cir.1993)), petitioner is not entitled to such a generous construction. Petitioner does not face the obstacles and challenges that a *pro se* litigant faces because petitioner is represented by counsel. In view of the resources at petitioner's disposal, this Court sees no reason to interpret petitioner's papers as raising arguments that neither petitioner nor his counsel saw fit to raise. Moreover, it would be unfair to respondents to construe petitioner's papers as raising a claim that petitioner, himself, failed to raise because respondents have not been afforded an opportunity to rebut this claim. Therefore, this Court holds that petitioner is not entitled to § 2254 relief on the ground that Burkett's statements to Investigator Fredricksen are so inconsistent with her trial testimony that it demonstrates that the prosecutor knowingly used perjured testimony.

Even if this Court were to interpret petitioner's papers as generously as Magistrate Judge Gershon did, however, this Court would find that the inconsistencies between Burkett's testimony and her statements to Investigator Fredrickson do not entitle petitioner to § 2254 relief. *See Gambino,* 59 F.3d at 365 (citations omitted) ("even a direct conflict in testimony does not in itself constitute perjury"). Although Burkett's statements are not entirely consistent with her trial testimony, petitioner has failed to demonstrate that the prosecutor knowingly elicited perjured testimony. Burkett's trial testimony that she did not have "any kind of relationship or friendship with [Brooks]," (Tr. at 111), does not contradict her statements that she worked around Brooks and that the prosecutor knew that Burkett knew Brooks very well. Working around someone nightly does not necessarily create a friend-

ship or a relationship. Similarly, knowing someone very well whom you work near does not create a friendship or a relationship. Moreover, far from seeking to hide the fact that Brooks and Burkett knew each other, the prosecutor elicited testimony from both Brooks and Burkett that they knew each other. In addition, although Burkett contradicted her trial testimony by stating that she and Brooks had never stayed at the same hotel, there is no evidence that the prosecutor was aware that Burkett and Brooks had not stayed at the same hotel. Therefore, Magistrate Judge Gershon correctly concluded that petitioner failed to demonstrate that the prosecutor knowingly elicited perjured testimony.

Even if this Court were to assume *arguendo* that Burkett's testimony regarding her relationship with Brooks was false, petitioner is not entitled to § 2254 relief. Because there is no evidence that the prosecutor knowingly used perjured testimony, petitioner would only be entitled to § 2254 relief if the false testimony were "material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Wallach,* 935 F.2d at 456 (quoting *Sanders,* 863 F.2d at 226) (brackets in *Wallach*). As previously discussed, the prosecution's case against petitioner was extremely strong. As a result, this Court believes that even if the jury had not heard this allegedly perjured testimony, petitioner certainly would have been convicted.

Accordingly, petitioner is not entitled to § 2254 relief on the ground that his conviction was the result of perjured testimony.

### 4. Alleged Prosecutorial Misconduct

Finally, petitioner contends that he is entitled to § 2254 relief on the ground that it was prosecutorial misconduct for the prosecutor to elicit Burkett's testimony that two police officers had warned her not to testify because petitioner had ties with the Mafia. Petitioner contends that despite the fact that the prosecutor knew that this evidence was improper, Burkett told Fredrickson that the prosecutor told Burkett to " 'mention it, men-

tion it in court.'" (Petition at 14 (quoting February 12, 1988, Fredricksen Interview with Burkett at 36.)

Magistrate Judge Gershon rejected petitioner's claim because "[e]ven had the prosecutor deliberately elicited the prejudicial mention of the mafia, it did not deny Magnotta a fair trial." Order at 16. This Court finds that the Report's finding regarding prosecutorial misconduct is neither clearly erroneous nor contrary to law.[8] *See* 28 U.S.C. § 636(b)(1).

■ Prosecutorial misconduct does not rise to the level of a federal constitutional violation warranting § 2254 relief unless "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471; 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)); *see also Gonzalez v. Sullivan,* 934 F.2d 419, 424 (2d Cir.1991). A denial of due process occurs only when the improper conduct causes "substantial prejudice" to the defendant. *See United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). Three factors determine whether a defendant suffered substantial prejudice: "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper [conduct]." *Modica,* 663 F.2d at 1181; *see also United States v. Rivera,* 22 F.3d 430, 437 (2d Cir. 1994) (citations omitted); *Floyd v. Meachum,* 907 F.2d 347, 355 (2d Cir.1990).

■ Examining these three factors in the instant case, this Court finds that petitioner is not entitled to § 2254 relief. Certainly the prosecutor engaged in inappropriate trial conduct when she elicited testimony from Burkett that Burkett had heard that Magnotta had ties with the Mafia. This testimony had no probative value and could have had a prejudicial effect. However, the trial judge quickly acted to cure the misconduct. As discussed and quoted previously, the judge

issued a thorough and powerful curative instruction. Moreover, the alleged prosecutorial misconduct does not rise to the level of a constitutional violation because petitioner almost certainly would have been convicted absent the improper conduct. *Modica,* 663 F.2d at 1181. As this Court has repeatedly stated throughout this Opinion and Order, the prosecution's case was very strong, and this Court firmly believes that the jury would have convicted petitioner absent the improper testimony regarding the Mafia.

Accordingly, this Court holds that petitioner's claim of prosecutorial misconduct does not entitled him to § 2254 relief.

### 5. *Rule 11 Sanctions*

At the end of this Opinion and Order, which has consumed a substantial quantity of this Court's time and resources, it is imperative to note some of the mistakes within the instant petition. Although a writ of habeas corpus allows a petitioner to gain access to the courts to challenge an illegal incarceration, this writ neither exempts a petitioner from complying with court rules nor permits a petitioner to raise frivolous arguments.

The instant petition fails to comply with the Local Rules for the Southern District of New York, and this Court's Individual Rules. Petitioner has failed to comply with Local Civil Rule 1(b), which states in relevant part:

> All pleadings, motions, and other papers that are submitted for filing must be signed by an attorney of record in said attorney's own name with the name clearly printed or typed directly below the signature and must show that attorney's address, telephone number, the initials of their first and last name, and the last four digits of that social security number.

In the instant case, petitioner's memorandum of law lacks a signature by an attorney of record, does not tell the Court the name of petitioner's attorney, does not provide the Court with the initials of the attorney's first and last name, and also lacks the last four digits of the attorney's social security number. Moreover, petitioner's memorandum of

---

8. Once again, this Court would uphold the Report's finding even if the *de novo* standard of

review applied in the instant case. *See* 28 U.S.C. § 636(b)(1).

law fails to comply with this Court's Individual Rule 1(a), which establishes requirements similar to Local Civil Rule 1(b).

In addition, petitioner's memorandum of law is woefully deficient because it relies almost exclusively on New York State law for authority. It appears that counsel fails to realize that a petition under 28 U.S.C. § 2254 is predicated on the argument that "a person in custody pursuant to the judgment of a State court ... [is being held] *in violation of the Constitution or laws or treaties of the United States.*" 28 U.S.C. § 2254 (emphasis added). By citing and arguing state law, counsel has failed to provide the Court with the precedent necessary to evaluate petitioner's claims. As any first-year law student should know, although a state must afford a criminal defendant the rights protected by the United States Constitution, a state may also extend further protections. Indeed, New York State provides many protections that extend beyond those guaranteed by the United States Constitution. Therefore, defense counsel should have supported his arguments with citations to federal law, not state law.

Yet, defense counsel's errors in failing to cite appropriate authority and failing to comply with court rules are dwarfed in comparison to the misstatements of fact in counsel's papers. In arguing that the prosecutor intentionally *sought to goad petitioner into* moving for a mistrial at the first trial, petitioner's counsel represented to this Court that "Nancy Brooks told Investigator Fredricksen in the interview conducted on December 10, 1987 (page 5) ... that she told the prosecutor that she would not testify." (Petition at 5.) However, the page cited by petitioner's counsel makes clear that Brooks was speaking about the second trial, not the first:

[Q]: Did you tell them you wouldn't testify[?]

[A]: Yes I did. They use to call me at my other number where, *the number that they had the first time* [.]

[Q]: Um hmm[.]

[A]: and I told them I didn't want to be bothered, to leave me alone and they continued to push it, came to my job and got me[.]

[Q]: *No, no what I'm what I'm asking you is the first trial.*

(December 10, 1987, Fredricksen interview with Rische at 5–6 (emphasis added).) The very passage that petitioner's counsel cites fails to support his argument, and neither does the rest of the record.

Counsel's double-jeopardy argument contains another misstatement of the record. Counsel represented to this Court that "Nancy Brooks ... indicated in her interview with investigator Fredricksen that she did not know when the first trial was to take place." (Petition at 6.) Counsel's reading of Investigator Fredricksen's Interview with Brooks is strained beyond the breaking point. During one part of the interview, Investigator Fredrickson asked Brooks, "[d]id they tell you there was a trial going on," and Brooks answered, "I don't remember." (December 10, 1987, Fredrickson Interview with Rische at 7.) In the portion of the interview that counsel cites, however, Brooks states both that she did not know and she knew about the trial:

[Q]: But did you know there was a trial going on the first time.

[A]: I don't I didn't know anything. I didn't care. I knew that they were involved doing someone was involving him[.]

[Q]: See cause this [ ...]

[A]: But I didn't know exactly what they were doing. I didn't know[.]

[Q]: No what I'm asking you [ ...]

[A]: Do I know that he was actually on trial[.]

[Q]: Right[.]

[A]: They told me, they told me that that was happening yeah but I didn't go I just ignored it[.]

*Id.* at 12. Thus, as previously discussed, Brooks alternatively stated that she did not remember whether the prosecutor had told Brooks about the first trial, that the prosecutor had not told Brooks about the first trial, and that the prosecutor had told Brooks about the first trial. Counsel's representation that this contradictory testimony indicates that Brooks "did not know when the

first trial was to take place" is untenable, inaccurate, and misleading. Counsel has ignored the facts and economized on the truth.

Counsel also misstates the record in asserting that Patricia Burkett testified that she read "Magnotta" on petitioner's name plate and that she read the name of the Elmsford Motel. In the petition, counsel wrote: "It was thus clear that when Assistant District Attorney Finnerty elicited testimony from Pat Burkett ... that she read the name of the motel and she read the name of Dennis Magnotta off the dashboard, that this information was known to her to have been false...." (Petition at 12.) Counsel's assertion is inaccurate, however, because Burkett never testified that she read petitioner's last name or the name of the motel. Rather, Burkett testified that she did not remember petitioner's last name or the name of the motel. (Tr. 70, 99–101.)

Remarkably, counsel makes an even more flagrant misrepresentation in arguing that the prosecution knowingly elicited perjured testimony that Brooks and Burkett did not know each other. (*See* petition at 16 ("the prosecutor knew this to be false and yet permitted the testimony to stand uncorrected").) As previously discussed, petitioner's petition states: "Burkett and Brooks knew one another despite their claim that they did not which was made on the record." (Petition at 16.) In petitioner's memorandum of law, counsel asserts that the prosecution improperly "presented" Burkett as a witness who did not know Brooks. (Memorandum at 8–9.) Counsel fails to support either of these statements with a citation to the trial transcript, and this failure is understandable because the testimony at trial flatly contradicts counsel's argument. The portions of the trial transcript that this Court quoted earlier make this fact abundantly clear. When Brooks was asked, "[n]ow Miss Brooks, do you know a woman named Patricia Burkett," she answered "[y]es." (Tr. at 158.) In fact, Brooks stated that she not only spent time in jail with Burkett but that she also had met Burkett on a prior occasion. *Id.* Similarly, when Burkett was asked "do you know a woman named Nancy Brooks," she answered "[y]es." (Tr. at 110–11.) Burkett also stated that she had met Brooks prior to trial. *Id.*

In asserting that Brooks and Burkett testified falsely that they did not know each other, and in asserting that the prosecutor presented Burkett as a witness who did not know Brooks, counsel has made an affirmative misrepresentation to this Court. Unlike some of counsel's other misstatements, no strained, selective, or tortured reading of the record can possibly support the assertion that "Burkett and Brooks knew one another despite their claim that they did not which was made on the record." (Petition at 16.) The record clearly, simply, and directly contradicts counsel's statement. Moreover, this Court believes that counsel's misrepresentation cannot be ascribed to mere negligence. While it was sloppy practice for counsel to fail to cite the record after asserting that a claim "was made on the record," it was an affirmative and deliberate misrepresentation to state that Brooks and Burkett testified that they did not know each other. This Court will not tolerate such conduct.

Counsel's slop-shod practice indicates that counsel fails to comprehend that a federal district court has a grave responsibility in assessing a petition for a writ of habeas corpus. In the instant case, this Court faces the serious question of whether the State of New York unconstitutionally has deprived petitioner of his liberty. In support of the instant petition, counsel has accused three witnesses of perjury, and has accused the prosecutor of suborning perjury, suppressing evidence, and other egregious misconduct. Counsel should only level such serious accusations if there is evidence to substantiate them.

Moreover, counsel fails to appreciate his responsibilities as an officer of this Court, seeking the release of a state-court prisoner who has been convicted of no less than ten violent felonies. Before seeking this Court's assistance, counsel has an obligation to read the record carefully and check the facts underlying his arguments. Far from fulfilling this obligation, however, counsel has submitted papers to this Court that contain errors, inaccuracies, half-truths, and outright misrepresentations. Counsel has raised frivolous arguments that are either utterly unsup-

ported by the record or only supported by counsel's tortured reading of the record. Apparently, counsel has viewed this petition as a roll of the dice, gambling that neither respondents, Magistrate Judge Gershon, nor this Court would spend the time to examine the record carefully and discover the half-truths and untruths on which several arguments are predicated. Counsel has rolled snake eyes.

This Court believes counsel's conduct may warrant sanctions under Federal Rule of Civil Procedure Rule 11, which states:

> By presenting ... the court [with] ... a pleading, written motion, or other paper, an attorney ... is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, ... the allegations and other factual contentions have evidentiary support....

Before Rule 11 sanctions can be imposed, however, a court must provide a party with a reasonable opportunity to respond. *See* Fed. R.Civ.P. 11(c). Rule 11(c)(1)(B) states:

> On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney ... to show cause why [he] has not violated subdivision (b) with respect thereto.

This Court finds that such an order is warranted in the instant case. Accordingly, defense counsel B. Anthony Morosco is ordered to appear before this Court at 2:30 p.m. on November 28, 1995, to show cause why this Court should not impose Rule 11 sanctions for the conduct described in this Opinion and Order.

Moreover, this Court is concerned by the fact that defense counsel failed to submit complete transcripts of Investigator Fredrickson's interviews with Nancy Brooks and Patricia Burkett. Counsel only submitted the portions of those transcripts that counsel claimed were relevant. In view of the misrepresentations in counsel's papers, this Court cannot rely on counsel's representation that the excluded portions are not relevant, and accordingly, this Court requires counsel to submit complete copies of all of the inter-

views that Investigator Fredricksen conducted in this case, including any and all notes.

### CONCLUSION

Petitioner's § 2254 motion is DENIED.

Defense counsel B. Anthony Morosco is ordered to appear before this Court at 2:30 p.m. on November 28, 1995, to show cause why this Court should not impose Rule 11 sanctions for the conduct described in this Opinion and Order.

On or before November 16, 1995, defense counsel B. Anthony Morosco is ordered to submit to this Court and to file with the Clerk of the United States District Court for the Southern District of New York copies of the full transcripts of all of the interviews that Investigator Fredricksen conducted in this case, including any or all notes.

On or before November 16, 1995, investigator Otis Steven Fredricksen is ordered to submit to this Court and to file with the Clerk of the United States District Court for the Southern District of New York copies of the full transcripts of all of the interviews that Investigator Fredricksen conducted in this case, including any or all notes.

SO ORDERED.