**UNITED STATES of America, Appellee,**

v.

**Leona M. HELMSLEY, Defendant–Appellant.**

**No. 94, Docket 92–1202.**

United States Court of Appeals, Second Circuit.

Argued Oct. 23, 1992.

Decided Feb. 16, 1993.

Robert H. Bork, Washington, DC (Joel I. Klein, Richard G. Taranto, Klein, Farr, Smith & Taranto, Washington, DC; Sandor Frankel, Bender & Frankel, New York City; Shea & Gould, New York City, on the brief), for defendant-appellant.

Cathy Seibel, Sp. Asst. U.S. Atty., New York City (Roger S. Hayes, Acting U.S. Atty., Jeffrey B. Sklaroff, Paul G. Gardephe, Asst. U.S. Attys., on the brief), for appellee.

Before: OAKES, NEWMAN, and PIERCE, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal primarily concerns the issue of whether a defendant's motion for a new

trial based on alleged prosecutorial misconduct may succeed if the circumstances supporting the claim of misconduct were known to the defendant at trial. The issue arises on an appeal by Leona M. Helmsley from the April 7, 1992, order of the District Court for the Southern District of New York (Thomas P. Griesa, Judge), which denied her motion for a new trial after her conviction on criminal charges relating primarily to income tax violations. We conclude that, in the circumstances of this case, the motion for a new trial was properly denied for lack of newly discovered evidence. We therefore affirm.

## Background

Helmsley was convicted on 33 counts of conspiracy, tax offenses, and mail fraud. On direct review, we affirmed the convictions, but remanded for resentencing on four counts. *United States v. Helmsley*, 941 F.2d 71 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992). While her direct appeal was pending, Helmsley filed a motion for a new trial under Fed.R.Crim.P. 33. Judge Griesa heard oral argument and denied the motion from the bench. He also denied her requests for discovery and for an evidentiary hearing. These rulings were elaborated in a written order and a later supplement.

The basic scheme with which Helmsley was charged involved using Helmsley business entities to pay personal expenses. The scheme served to understate Helmsley's income by omitting benefits that should have been treated as imputed income, and thus to lower her taxes. Because the business entities deducted these payments, they also received a tax advantage to which they would not have been entitled, at least in some instances, had the true nature of the expense properly been disclosed. The scheme was accomplished primarily through false invoices that reflected personal expenses for work done at the Helmsley residence as if they were business expenses for work done at or for Helmsley corporations.

At trial, the prosecution proceeded on the theory that Helmsley and her co-conspirators had duped not only the Government, but also her accountants, the firm of Eisner & Lubin ("E & L"). That the accountants were misled by the false invoices was emphasized by the Government repeatedly, in opening and closing argument, and in the testimony of three E & L accountants. Conceding that she had authorized payment by various Helmsley businesses of expenses for work at her Connecticut home, Helmsley claimed that she had no intent to commit tax fraud. Her defense was that she had relied on her accountants to make the proper allocations of expenses for tax purposes. If they had improperly deducted on the corporate returns the personal expenses charged to the businesses and had improperly failed to include those items as income on her personal returns, they had come up with the idea to do so either on their own or with her co-conspirators.

Helmsley now claims that the Government knew that the testimony of the accountants was false, particularly the testimony of E & L partner Gerald Marsden. She bases this assertion on the workpapers of a non-witness, E & L accountant Arthur Nowak, and on reports of meetings between Nowak and James DeVita, the lead Assistant United States Attorney in the prosecution through trial. These documents concern the calculation of the income of one of the Helmsley Corporation's properties, the Graybar Building in Manhattan. For this property, the accountants needed to calculate net income earned by the building not only for tax purposes but also for determining the lease payment due the lessor of the land. The lease payment was based in part on a percentage of the building's rental income (the "overage rent"). Nowak deducted certain Helmsley personal expenditures paid by the corporation in calculating the corporation's taxable income. But in determining the overage rent, Nowak did not deduct these expenditures, thereby acknowledging to the lessor more income than was reported to the IRS. Although the definition of operating income in the lease differed somewhat from that used for taxes (accounting for differential treatment of some items), the personal ex-

penses, disguised by use of false invoices, would have been deductible for both purposes if the invoices' indication of their business nature had been correct. The available inference is that Nowak, apparently more concerned about scrutiny by the lessor than by the IRS, knew the expenses were personal but nevertheless improperly used them to reduce the corporation's taxable income.

The Government noticed this differential treatment before trial. Recognizing that the discrepancy might indicate guilty knowledge on the part of the accountants, DeVita interviewed Nowak twice, in March and April 1988. There is some dispute as to what occurred at those meetings. The only contemporaneous record of the March meeting made available to the District Court consists of notes taken by Nowak's attorney, Edward Daus. The Daus notes seem to indicate that DeVita had shown copies of various false invoices to Nowak, and Nowak had denied having seen them. During the new trial motion proceedings in the District Court, the Government first claimed, quite vigorously, that Nowak never made such a denial, because it would be "obvious[ly]" and "plainly" untrue. Indeed, Nowak's workpapers made explicit reference to the documents. Confronted with the Daus notes, the Government later contended that DeVita must have shown Nowak different invoices when he denied having seen them, perhaps original, unaltered invoices from the Helmsley files as opposed to the doctored, false invoices.

The Daus notes also indicate that at the March meeting, DeVita asked specifically why Nowak had treated the expenditures differently, and Nowak had said only "don't know." At the April meeting, however, according to DeVita's affidavit, Nowak gave a much fuller explanation. DeVita states that Nowak said he had probably been told by Joseph Licari, the Chief Financial Officer of Helmsley Enterprises and one of Helmsley's co-defendants, to "back out" these expenditures.[1] The affidavit also reports that Nowak claimed that Licari often told him to "back out" expenditures, that Nowak did not know why the expenditures were backed out, and that Licari may have given these instructions in either a phone call or a "representation letter."

Helmsley now asserts that this explanation, even if accurately reported in the DeVita affidavit, defies belief. First, she claims that Nowak had lied before, and would have particular reason to lie here because a truthful answer would be inculpatory. Second, she observes that the representation letter is a letter prepared by the *accountants* for the signature of the client. It serves to verify certain representations made by the client during the year. Thus, the letter could not be the source of the original instructions to "back out" expenditures; at most, the letter confirmed previous instructions. Third, she observes that Nowak, a certified public accountant, certified the Graybar overage rent calculation and also prepared Graybar's tax return. Her expert accountant, by affidavit, asserts that certifying a statement with so little knowledge of the basis for a puzzling discrepancy would be so unprofessional as to make it unlikely to have occurred. Fourth, she notes that the explanation was put in very couched, hesitant language even though Nowak (and his counsel) had had a month to prepare an answer to this very question. Finally, she relies on the affidavits and testimony (at other proceedings) of her co-defendants Licari and Frank Turco in which they assert that E & L was aware of the false invoice scheme.

## Discussion

### 1. Prosecutorial misconduct

It is common ground that to challenge a conviction because of a prosecutor's knowing use of false testimony, a defendant must establish that (1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was "any reasonable likelihood that the false testimony could have affected the judgment of the

1. There seems to be no dispute that "back out" is used here to mean "remove," rather than "calculate an amount from analysis of other figures of which the amount is a component."

jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). When such challenges are made on a collateral attack, as they usually are, they are subject to the requirement of due diligence on the part of the defendant. A post-trial motion under Fed.R.Crim.P. 33 based on newly discovered evidence must be supported by evidence "discovered after trial ... that ... could not, with the exercise of due diligence, have been discovered sooner." *United States v. Slutsky*, 514 F.2d 1222, 1225 (2d Cir.1975). A motion to vacate a sentence under 28 U.S.C. § 2255 (1988) must be supported by cause for the defendant's failure to raise his claim earlier. *See Billy–Eko v. United States*, 968 F.2d 281, 282–83 (2d Cir.1992); *Campino v. United States*, 968 F.2d 187, 189–90 (2d Cir.1992). Such cause can be established by showing that the claim is based on newly discovered evidence that could not reasonably have been discovered before trial.

In some cases, the defense suspected at trial that a prosecution witness lied and that the prosecutor either knew or should have known of the perjury, but did not learn until after trial facts that establish the perjury. In *United States v. Wallach*, 935 F.2d 445 (2d Cir.1991), for example, a prosecution witness's denial of gambling was shown to be false, after the defendant's trial, when the witness was convicted of perjury. *See id.* at 455. In other cases, the defense learns for the first time after trial facts indicating the falsity of a witness's testimony and the prosecutor's knowledge of the falsity. In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), after the defendant's trial, the prosecutor disclosed that he had made a promise, falsely denied by a witness at trial, of lenient treatment to the witness, *id.* at 152–53, 92 S.Ct. at 765–66, and in *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the prosecutor disclosed in a *coram nobis* petition filed on behalf of a witness that he had made a promise, denied by the witness at trial, that a recommendation of a reduced sentence for the witness would be made, *id.* at 266–67, 79 S.Ct. at 1174–76.

Normally the requirement that a collateral attack must be supported by evidence not available by reasonable diligence at trial applies to claims of a prosecutor's knowing use of false testimony. In *United States ex rel. Regina v. LaVallee*, 504 F.2d 580 (2d Cir.1974), *cert. denied*, 420 U.S. 947, 95 S.Ct. 1330, 43 L.Ed.2d 425 (1975), a Government witness denied having made a deal for lenient treatment. Defense counsel knew, or at least thought, that this statement was untrue, and tried to discredit it on cross-examination. But defense counsel did not call two witnesses who he knew could have contradicted the statement. In defendant's habeas proceeding, which alleged intentional prosecution use of perjury, we denied even an evidentiary hearing, because defendant could have brought out at trial the possibility that the witness was lying. *Id.* at 583. *See also United States v. Iverson*, 648 F.2d 737, 738–39 (D.C.Cir.1981) (petition for rehearing); *Ross v. Heyne*, 638 F.2d 979, 986 (7th Cir.1980); *United States v. Meinster*, 619 F.2d 1041, 1045 (4th Cir.1980); *Evans v. United States*, 408 F.2d 369, 370 (7th Cir. 1969); *United States v. Branch*, 261 F.2d 530, 533 (2d Cir.1958), *cert. denied*, 359 U.S. 993, 79 S.Ct. 1125, 3 L.Ed.2d 981 (1959); *Green v. United States*, 256 F.2d 483, 484 (1st Cir.), *cert. denied*, 358 U.S. 854, 79 S.Ct. 83, 3 L.Ed.2d 87 (1958).

In a few instances, however, we and other courts have either held or at least suggested that in some limited circumstances a defendant's awareness at trial of a prosecutor's knowing use of false testimony does not necessarily preclude a collateral attack. In *United States ex rel. Washington v. Vincent*, 525 F.2d 262 (2d Cir.1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976), we granted relief despite the fact that at trial the defendant knew or at least suspected that a prosecution witness had falsely denied making a deal with the State and that the prosecutor was aware of this perjury. We noted that counsel had not been without remedies at trial. "He could, for example, have requested a side-bar conference or an *in camera* proceeding at which he could put the matter of [the prosecutor's] promises

directly to the prosecutor." *Id.* at 268 n. 8. Nevertheless, we said that "it would be inappropriate not to permit [the defendant] to challenge the egregious and highly damaging prosecutorial misconduct solely because he and his lawyer may have failed to utilize all available means for exploring the prosecutor's high-handedness at the trial." *Id.* at 268. We noted, however, that "[a] contrary decision might be indicated in a case where the possible harm was less pronounced, particularly where promising opportunities to resolve the issue of prosecutorial misconduct at trial were clearly available." *Id.*

Somewhat similar is *United States v. Valentine*, 820 F.2d 565 (2d Cir.1987), where the defendant, a stockbroker, was convicted of false statements to a grand jury for denying receipt of a loan to be used for a political contribution. In that case, the prosecutor misrepresented to the jury that a series of similar payments to nine other brokers were all loans to be used for political contributions. Four of these brokers had testified at the grand jury and had either denied receipt of funds or disputed their nature as loans. Though we noted that the defendant had "some knowledge" of the misrepresentation as to two of the brokers called to the grand jury, and "failed to take advantage of his access to these brokers," we nonetheless reversed the conviction because the defendant's "failure does not allow the prosecutor to make misrepresentations." *Id.* at 571. We also noted that the defendant had no knowledge of the misrepresentation as to the other two brokers who had been grand jury witnesses. *Id.* In *Mills v. Scully*, 826 F.2d 1192 (2d Cir.1987), we cited *Valentine* for the proposition that "[e]ven where defense counsel is aware of the falsity, there may be a deprivation of due process if the prosecutor reinforces the deception by capitalizing on it in closing argument, ... or by posing misleading questions to the witnesses." *Id.* at 1195 (citations omitted). *See also DeMarco v. United States*, 928 F.2d 1074, 1076–77 (11th Cir.1991) (defendant's knowledge irrelevant when "prosecutor's argument to the jury capitaliz[ed] on the perjured testimony"). The statement in

*Mills* was dictum since *Mills* reversed the grant of a writ of habeas corpus. *Mills* involved a witness's denial at trial that she had testified before the grand jury. In fact, the witness had testified, and defense counsel had a transcript of her testimony. Either through negligence or through deliberate strategy, defense counsel did not further press the witness to explain her grand jury testimony, which contradicted her trial testimony.

■ These decisions create at most a limited exception to the normal requirement of due diligence with respect to collateral attacks based on a prosecutor's knowing use of false testimony. The exception arises where the prosecutor is claimed not merely to have been aware of circumstances indicating the falsity of a witness's testimony but to have been directly involved as a participant in the transaction about which the witness has allegedly lied. Thus, in *Washington*, the prosecutor knew the witness had falsely denied a deal because he had made the deal with the witness; in *Valentine*, the prosecutor knew the grand jury witnesses had testified contrary to the prosecutor's representations because he had elicited their grand jury testimony; and in *Mills*, the prosecutor knew the witness had falsely denied testifying at the grand jury because he had called her as a witness.

The prosecutor's role in the falsity of a witness's statement has a dual significance. First, it eliminates the factual issue as to whether the prosecutor was aware of the falsity. Second, it creates a special difficulty for the defendant at trial because, even if the defendant has some basis for challenging the witness's statement, such a challenge runs the risk of implicating the credibility of the prosecutor before the jury. As we noted in *Washington*, "The harm in the present case was caused not so much by unawareness that [the witness's] testimony may have been perjured as by inability to respond effectively in view of [the prosecutor's] silence." 525 F.2d at 268 n. 9.

Moreover, the cases in which we have granted relief, *Washington* and *Valentine*,

both involved at least some evidence of the prosecutor's knowledge of the perjury that was not available at trial. In *Washington,* the new evidence was the prosecutor's statement at the sentencing of the witness that a deal had been struck. In *Valentine,* the new evidence was the grand jury transcript, which had been unavailable to the defendant prior to or during his trial and which confirmed his suspicions that the prosecutor had misrepresented grand jury testimony.

Thus, the rule we synthesize from these decisions is less expansive than the dictum in *Mills,* which suggested that a due process violation "may" result if a prosecutor reenforces testimony he knows is false, despite the defendant's awareness of the falsity. We have never permitted a successful collateral attack for a prosecutor's knowing use of false testimony based entirely on evidence of which the defendant was aware, or in the exercise of reasonable diligence should have been aware, at trial, and we have permitted such an attack to succeed, despite the existence at trial of some basis for the defendant to suspect the prosecutor's knowing use of false testimony, only where the prosecutor was directly involved in the falsity.

 Applying these standards, we have no doubt that Helmsley's collateral attack was properly rejected. As presented to the District Court, Helmsley's new trial motion alleged that Marsden's testimony at trial falsely denied that he and his accounting firm had been aware that Helmsley was charging personal expenses to her companies, and that the prosecution was aware of the falsity of his testimony. At oral argument, appellant's contention somewhat shifted. Abandoning, or at least not relying on, the claim that Marsden testified falsely, she contended that Nowak, who did not testify, knew of the improper charging of personal expenses, that his knowledge demonstrated knowledge of the fraud by the accounting firm, that the Government knew or should have know of the firm's knowledge, and that the Government acted improperly in eliciting testimony and argu-

ing to the jury that the accounting firm lacked knowledge of the fraud.

Whether the collateral attack is aimed at Marsden's knowledge or Nowak's knowledge, it fails because it rests entirely on inferences from circumstances all of which were known to the defense prior to the trial. As particularized at oral argument, Helmsley relies on three circumstances. First, Nowak removed certain personal expenses from the calculation of the Graybar income for purposes of determining the ground rent due the lessor but left these expenses in the calculation of Graybar income for purposes of determining taxable income. Second, when Nowak was questioned by DeVita on March 3, 1988, Nowak denied having previously seen invoices shown to him by DeVita, and the falsity of this denial was inferable from the fact that the invoices were attached to Nowak's handwritten workpapers. Third, when Nowak was again questioned by DeVita on April 4, 1988, and asked to explain the differing treatment of certain expenses in calculating Graybar income, Nowak said that he might have done so at Licari's direction, an explanation that appellant contends is preposterous.

As appellant forthrightly acknowledged at oral argument, "These were facts that were available to the defense. There's no doubt about that." Transcript of oral argument at 5. Nowak's workpapers and the pertinent invoices were all turned over to Helmsley's trial counsel prior to trial. Nowak's attorney, Daus, accompanied Nowak to the March 3 and April 4 interviews with DeVita, and turned over his notes of these interviews to Helmsley's trial counsel prior to trial. Appellant's argument seeks to draw the inferences that Nowak must have known that Helmsley's deductions were improper, that his accounting firm must have had such knowledge, and that the Government must have known that Nowak and the accounting firm had such knowledge. Yet all the evidence on which these inferences rest was available to Helmsley prior to the trial.[2]

2. Helmsley claims that new evidence can be

found in DeVita's response to Helmsley's mo-

Appellant presents no circumstance excusing her failure to show at trial the falsity she now asserts should be attributed to Nowak's denial of knowledge. Unlike prior cases where collateral attacks have succeeded, there is no new evidence that any trial witness lied, nor is there any new evidence that Nowak or other non-testifying accountants falsely denied knowledge of the fraud. Indeed, Nowak steadfastly continues to assert in a post-trial affidavit that he had no knowledge of Helmsley's fraud.[3] Furthermore, there is not even a claim that a prosecutor had a personal involvement in any alleged falsity, such as the prosecutor's promise of leniency to a witness in *Washington* or the eliciting of grand jury testimony in *Valentine*. Appellant's entire claim both of falsity and Government awareness rests on inferences sought to be drawn from highly equivocal circumstances. Though Judge Griesa cannot be faulted for declining to draw the damning inferences now claimed to be so obvious by appellate counsel,[4] the denial of the new trial motion is fully supportable by trial counsel's failure to present at trial the circumstances and documents, then fully known, alleged to support such inferences.

In this case, Helmsley not only is unable to establish a justifiable excuse for her failure to challenge the accountants' testimony at trial, but it appears that her choice not to do so may have been deliberate. Armed with copies of Nowak's workpapers and the Daus notes of the Nowak interviews, Helmsley's trial counsel easily could have called Nowak or could have impeached the testifying accountants on the basis of the Graybar overage rent calculations. Doing so, however, would have run the distinct risk that one or more of the accountants might have abandoned a denial of knowledge and pointed to Licari or even Helmsley as the orchestrator of the fraud.

Helmsley's new trial claim was properly denied, and did not warrant an evidentiary hearing or discovery. No hearing is re-

---

tion. Yet far from conceding knowledge of perjury, DeVita's affidavit reiterates the Government's belief that no perjury occurred, and does not state that the Government knew of perjury. Helmsley argues that the equivocal tone of certain statements in the affidavit renders the entire affidavit not only unbelievable, but adequate to support the inference that the *opposite* of what the affidavit claims is true. Putting aside whether new evidence can ever consist of the Government's response to a motion that supposedly rests on new evidence, we do not find in DeVita's affidavit any basis to support the inferences Helmsley would attribute to it.

3. As indicated above, Helmsley suggests five reasons for disbelieving this statement. None of these reasons convinces us that Helmsley has now established or could establish through an evidentiary hearing that it is more likely than not that Nowak knew of the false invoice scheme. The possibility that Nowak might have lied at the March 3 meeting on a related matter merely indicated that the Government should have given careful attention to his responses, and the Government properly required Nowak to give a fuller explanation at the April 4 meeting. Nowak's statements about the representation letter were ambiguous, and could certainly have been understood to indicate only that the representation letter confirmed earlier statements of Licari. Even if, as we are willing to assume and as appellant contends, Nowak's reliance on Licari was in violation of professional standards, the evidence at trial indicated that the E & L accountants were not exemplars of

their profession; it is not unreasonable to believe that Nowak followed the directions of Licari without proper investigation. Further, we attribute less significance than Helmsley to the tone of the statements attributed to Nowak in the DeVita affidavit. In attempting to recall events of many months ago, an individual might well offer several possible explanations in somewhat tentative terms. Finally, the statements of Helmsley's co-conspirators were consistent with positions taken at trial in an attempt to shift blame onto the accountants. The jury apparently did not believe the co-conspirators, and we see no reason to upset that determination.

4. Helmsley's evidence of Government knowledge is basically the same as that which she claims tends to show that Nowak was lying in the first place. Since Judge Griesa was entitled to find this evidence inadequate to establish that Nowak was untruthful, he was clearly entitled to find that it was not adequate to establish that the Government knew or should have known that Nowak was untruthful. Helmsley's further arguments on this point add little support. She observes that the Government originally listed Nowak as a witness, and then dropped him. The Government adequately explains this decision as an attempt to comply with the District Court's instruction to "streamline" the trial. We also reject Helmsley's contention that the tone of DeVita's affidavit should lead us to conclude that DeVita was attempting to cover up knowledge of the accountants' awareness of the false invoice scheme.

quired on a new trial motion if "[t]he moving papers themselves disclosed the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have been unavailing." *Slutsky*, 514 F.2d at 1226; *see also United States v. Salerno*, 868 F.2d 524, 541 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).

### 2. Brady claim

■ Helmsley also asserts that the Government's nondisclosure of certain evidence alleged to undermine Marsden's credibility was so prejudicial as to require a new trial under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The relevant evidence concerns the Government's decision not to prosecute Marsden in a separate proceeding involving fraudulent financial statements prepared for another E & L client, Robert Landau Associates ("RLA"). After her trial, Helmsley obtained an affidavit from Charles Lockwood, RLA's vice-president, who had pled guilty in the RLA matter and had not been sentenced until after the start of Helmsley's trial; Helmsley contends that the three-year delay in sentencing Lockwood was intended by the Government to prevent her earlier access to him. Lockwood's affidavit alleges that the evidence against Marsden in the RLA matter was fairly strong, a fact Helmsley alleges she had not previously known.[5] On the basis of this record, she claims that the decision not to indict Marsden was motivated by the goal of maintaining him as a credible witness in her trial, and that the Government made insufficient disclosure of its materials concerning Marsden. She claims that these materials would have been useful not only in showing that Marsden had made a deal with the Government but also in rebutting Marsden's claim that he had been duped in preparing a letter for RLA, just as he claimed he had been duped by Helmsley.

Judge Griesa properly found the *Brady* claim to be without merit. There is no basis for questioning his acceptance of the representations of the RLA prosecutor that the decision not to prosecute Marsden was reached independent of any concern for the Helmsley case. Ample materials concerning Marsden were turned over to Helmsley's trial counsel. Moreover, the claim that Lockwood's sentencing was delayed to thwart Helmsley's access to him is refuted by the fact that he was sentenced several days prior to the start of Marsden's testimony. At most, as Judge Griesa noted, Helmsley has shown no more than a slightly enhanced basis for challenging Marsden's credibility. In view of the substantial attack on Marsden's credibility developed at trial, the withheld evidence fails to "create[ ] a reasonable doubt that did not otherwise exist," *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2402, "sufficient to undermine confidence in the outcome," *see United States v. Petrillo*, 821 F.2d 85, 89 (2d Cir.1987) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)).

### Conclusion

Helmsley has not made an adequate showing to justify a new trial, an evidentiary hearing, or discovery. We affirm the order of the District Court.

---

**5.** Specifically, the affidavit asserts that Marsden knew a *comfort letter* was fraudulent when he signed it because he was aware that the company's financial condition was very poor.