**Larry THOMAS, Petitioner,**

**v.**

**Robert KUHLMAN, Superintendent, Sullivan Correctional Facility; Dennis Vacco, Attorney General of New York, Respondents.**

**No. 97–CV–2096 (JBW).**

United States District Court,
E.D. New York.

April 7, 2003.

Richard Joselson, Esq., The Legal Aid Society, Criminal Appeals Bureau, New York City, for Petitioner.

Morgan Dennehey, Esq., Assistant District Attorney, Kings County, Brooklyn, NY, for Respondents.

### MEMORANDUM, ORDER & JUDGMENT

WEINSTEIN, Senior District Judge.

I. Introduction

At trial in this murder case, the prosecution elicited pivotal testimony from its key witness that she observed defendant on the fire escape of the victim's apartment building shortly before the victim was killed. When considered in the context of the state's case as a whole, this testimony placed defendant precisely at the window of the victim's apartment just before the murder.

It is now undisputed that it was physically impossible for the witness to have seen defendant at the victim's window, since the fire escape that abuts the victim's apartment was not visible from her vantage point. Even a rudimentary inspection of the crime scene would have made this crucial fact clear to police, prosecution and defense counsel.

Counsel's failure to make any investigation of the crime scene left him unable to challenge the witness's account and unable to counter the prosecution's factually incorrect summation argument—supported by the trial court's marshaling of the evidence—that defendant was seen on the fire escape of the victim's apartment shortly before her murder. Because the remaining evidence presented by the state was relatively slight and the jury was on the verge of hanging—requiring an *Allen* charge—there is a substantial likelihood that the jury would not have convicted defendant if the witness's testimony had been refuted.

Although defense counsel's performance was, in general, highly professional and efficacious, his failure to perform an adequate investigation in preparation for trial rendered his performance constitutionally ineffective. Defendant's petition for a writ of habeas corpus will be granted. His actual innocence or guilt of the crime of conviction is not implied.

This case raises the recurring issue of the ethical obligations of counsel when defending an impecunious client. *Cf. Jelinek v. Costello*, 247 F.Supp.2d 212, 280–81 (E.D.N.Y.2003) (interplay between wealth and representation). In particular, the state or defense counsel has a duty to expend resources for necessary investiga-

tions where a criminal defendant is unable to afford the attendant expenses.

## II. Facts

Eva Sawyer, a social acquaintance of defendant, was beaten and stabbed to death in her apartment in Brooklyn in May 1988. Police investigators found no evidence of forced entry into her apartment. The door and all windows were locked save for the window leading to the fire escape.

The day after the murder, defendant voluntarily accompanied a police detective to the precinct for questioning. He was asked about and described his romantic relationship with the victim, and suggested that he had recently endeavored to end it. He claimed not to have seen her for several days prior to her murder. He also stated that he had spent the entire night in question with another woman.

During the interview, detectives noticed spots that appeared to be dried blood on defendant's sneakers. He claimed the spots were mud from a newly planted tree, and over protest surrendered the sneakers to the police. Later testing proved the spots to be Type O blood, consistent with the victim's blood type (along with 45 percent of the population) but not with defendant's. He was subsequently arrested in July 1988.

At trial in June of the next year, proof of defendant's guilt included the evidence that blood spots on his sneakers were consistent with the blood type of the victim, that he enlisted a girlfriend in an attempt to falsely corroborate his alibi, and—most critically—that a witness had observed him on the fire escape just outside of the victim's apartment immediately before the crime was committed.

Although defendant persistently challenged the admissibility of the blood evidence at trial and on appeal, *see People v. Thomas*, 188 A.D.2d 569, 569–72, 591

N.Y.S.2d 464 (2d Dep't 1989), he does not now press that claim.

The only issues in the present proceeding center on the witness testimony concerning defendant's presence on the fire escape of the victim's apartment.

Various police officers at trial established the likelihood that the murderer had entered or exited the victim's locked, second-floor apartment through a window opening onto the fire escape. The victim's cousin testified that the apartment's fire escape was at "the rear of her building." Trial Tr. at 55. There was no testimony at trial that there were other fire escapes on the building aside from one on the front of the building.

Having established that the murderer likely utilized the only fire escape that was located at the rear of the victim's building, the prosecution called as a witness Yvette Walker Artis (variously referred to in court papers as "Walker" and "Artis"), a young woman who at the time of trial was being held at Riker's Island on felony drug possession charges. On direct examination she acknowledged that in exchange for her testimony the district attorney would allow her to plead to a misdemeanor offense, thus avoiding altogether what might have been a potential 25–year prison sentence. Artis, whose parents lived at 836 Crown Street—the apartment building situated across a courtyard from 826 Crown Street, where the victim resided—was at her parents' apartment building on the evening of the murder.

At trial, Artis testified that at about 2:00 a.m. she was in a stairwell in her parents' building, staring out of a window that overlooked 826 Crown Street. As she stated on direct examination, from this vantage point she could see the back of the victim's building:

Q. Where is 836 Crown Street in relation to 826 Crown Street?

A. Right next door.

Q. When you look at the back of the buildings, what does it look like from there?

A. A courtyard, people's windows and fire escapes.

Q. And can you see the fire escapes of 826 Crown Street from 836 Crown Street?

A. Yeah, if the [hallway] window's open.

*Id.* at 216–17. Artis, who had not been entrusted with a key to her parents' apartment, was waiting to be let into the apartment when she "saw something move across 826 on the fire escape," and then "saw somebody on the fire escape" on the second floor of the building. *Id.* at 218.

Although she had failed to identify defendant when police first showed her his photograph during their investigation of the murder, at trial she identified defendant as the man she observed on the fire escape at a second floor apartment window. If her testimony was credited by the jury, then it could only have concluded that defendant was on the fire escape outside of the victim's apartment at about the time of the murder.

Defense counsel's examination of Artis more firmly fixed for the jury the (incorrect) assumption that the apartment Artis observed was the victim's. On cross examination, counsel queried Artis about the layout of the buildings and the fire escapes:

Q. Now, when you're looking out this window, can you describe for us— you said the buildings are next to each other. How can you see the other building?

A. Because it's a courtyard and you can see all the back windows to the back apartments and the side apartments, like this. So, there is a gate here, and then this window is here, and there's some buildings here.

Q. How many fire escapes go across the back of that building?

THE COURT: You're talking about 826?

[DEFENSE COUNSEL]: Right.

A. There's one to every floor, only on one side of the building that I know of.

Q. Only one fire escape that goes from the top of the building to the bottom, or—more than one?

A. One from the top to the bottom.

. . . . .

Q. And there's only one fire escape that goes all the way down?

A. I didn't build the building. I'm telling you how the building is.

. . . . .

Q. You say there's only one fire escape?

A. On the back of the building.

Q. Where are the other fire escapes?

A. In the front.

. . . . .

Q. So, there's only one fire escape in the front, and one in the back?

A. Yeah.

*Id.* at 241–46. Artis's testimony with respect to the layout of the buildings and the fire escapes was never refuted, no pictures of the buildings or fire escapes were introduced into evidence, and no diagram of the buildings was ever presented to the jury.

If the jury believed Artis's testimony that she had seen a man on the rear, second floor fire escape of 826 Crown Street, then it is clear—given the uncontradicted testimony of the police officers, the victim's cousin, and Artis—that the only conclusion the jury could reasonably

have reached is that the man Artis observed that evening was on the *victim's* fire escape, trying to get into the *victim's* apartment. This is precisely what the prosecutor argued to the jury in his summation, where he stated without objection that defendant "entered through a window," that "Evette Walker [Artis] saw him at the window at the time of the crime," and that "a further circumstance which prove[s] this is the man who murdered Eva [Sawyer]" is that he was "on the fire escape at 2 a.m." *Id.* at 344. The trial judge herself, in marshaling the evidence for the jury, likewise stated that "[t]he prosecution contends that they have proved ... that defendant was seen on Eva [Sawyer's] fire escape by Evette Walker [Artis]." *Id.* at 395.

It is now undisputed that none of the rear windows or back apartments of the victim's building are visible from the window from which Artis purportedly saw the defendant. At a hearing in the court, pictures and concessions established this critical discrepancy as a matter of fact. At most, therefore, Artis observed defendant on an entirely distinct fire escape from that abutting the victim's apartment, outside of the window to apartment B–4 instead of the window to the victim's apartment, which was B–7. This information was available to both the prosecution and defense in the police reports filed during the investigation, though it was never brought to the attention of the jury by either side at trial. *See* Pet'r's Appx. in Support of Pet. for Writ of Habeas Corpus, at A62 (police report indicating victim's apartment was B–7); *id.* at A63 (police report indicating that the apartment viewed by Artis was B–4); *id.* at A64 (police report indicating that apartment B–4 was occupied by Shade Olmo and her family).

The case was submitted to the jury, which after calling for exhibits and deliber-ating for some time indicated to the trial court that it was deadlocked and could not reach a decision. After the trial court urged the jury to try to reach a consensus, a verdict of guilty was delivered at 5:09 p.m. on the Friday before the Memorial Day weekend. Defendant was sentenced to 25 years to life in prison.

### III. Procedural History

Defendant filed a timely notice of appeal. In his brief he raised five claims: (1) that his sneakers and the serology tests performed on them should have been suppressed because officers seized them without probable cause to arrest him; (2) that the in-court identification testimony of Artis should have been suppressed because the police-arranged identification procedures were impermissibly suggestive; (3) that the trial judge improperly delegated responsibility for presiding over the pre-charge conference to her law assistant; (4) that the trial judge marshaled the evidence in an unfair manner in her charge; and (5) that the prison sentence was excessive. In December 1992, the Appellate Division affirmed defendant's conviction, noting inter alia that although the photograph shown to witness Artis was suggestive, an independent source for her identification of defendant was her opportunity to observe him on the fire escape. *People v. Thomas*, 188 A.D.2d 569, 572, 591 N.Y.S.2d 464 (N.Y.App.Div.1992). Permission to appeal to the New York Court of Appeals was denied in May 1993. *People v. Thomas*, 81 N.Y.S.2d 1021, 600 N.Y.S.2d 209, 616 N.E.2d 866 (1993).

In February 1994, defendant filed before the trial court a motion to vacate his conviction pursuant to section 440.10 of the New York Criminal Procedure Law. In that motion he argued first that the trial prosecutor denied him due process of law under the federal constitution by eliciting

and then exploiting testimony from Artis concerning the layout of the crime scene that the prosecutor knew or should have known to be false. Second, he argued that his trial attorney denied him the effective assistance of counsel by failing to conduct an adequate investigation of the crime scene, by failing to review the police reports concededly in his possession, and by failing to interview two potentially exculpatory witnesses. The motion was denied without a hearing in August 1994.

Permission to appeal to the Appellate Division was granted, but in April 1996 that court affirmed the denial of the motion to vacate the conviction. *People v. Thomas*, 226 A.D.2d 484, 641 N.Y.S.2d 48 (N.Y.App.Div.1996). In dismissing defendant's ineffectiveness argument, the appellate court summarily stated that it "agree[d] with the People that defense counsel's failure to cross-examine the witness as to her inability to see the fire escape which led to the victim's room did not constitute ineffective assistance of counsel." *Id.* at 485–86, 641 N.Y.S.2d 48. It was, and is, the prosecutor's argument that defendant could have climbed to the top of the roof of the building on the fire escape that the witness could see, crossed over the roof and then descended the fire escape abutting the victim's apartment. The state courts apparently accepted this argument. The Appellate Division wrote:

> The defendant argues that the proof which he adduced in connection with his motion to vacate the judgment of conviction established conclusively that the witness noted above could not have seen the "rear" fire escape of the victim's building from the vantage point that she had described during the trial testimony. Also, the defendant asserts that the proof submitted with his post-judgment motion established conclusively that the only fire escape which was in fact visible to the witness did not provide access to the victim's apartment. Based on this

premise, the defendant argues that the prosecutor committed "official misconduct" in failing "to correct false testimony".

The People respond by asserting, among other things, that whether the fire escape which was in fact visible to their key witness was adjacent to the "rear" or rather to the "side" of the victim's building is a matter of semantics. The People also assert that this witness, at trial, did not specifically testify that it was the fire escape outside the victim's apartment upon which she had seen the defendant.

The Supreme Court denied the motion without a hearing. We affirm.

It may well be that the fire escape referred to by the prosecution witness noted above would more accurately have been described as one located on the side, rather than at the rear, of the victim's apartment building. Also, it may well be that this fire escape did not give direct access to the victim's apartment. However, these facts were plainly discoverable by the defendant at the time of trial, and thus he may not rely upon C.L. 440.10(1)(g) in support of his argument that he was entitled to a hearing as a matter of law.

We agree with the People that there was no deliberate attempt by the prosecutor to submit the case to the jury based upon proof which he knew or should have known to be false. We also agree with the People that defense counsel's failure to cross-examine the witness as to her inability to see the fire escape which led to the victim's room did not constitute ineffective assistance of counsel. There was no evidentiary showing sufficient to warrant a hearing as to the defendant's motion insofar as it was made pursuant to C.L. 440.10(1)(b), (c),

(f), and (h). The order appealed from should therefore be affirmed.

226 A.D.2d at 485–86, 641 N.Y.S.2d 48 (citations omitted).

The New York Court of Appeals denied leave to appeal this decision in August 1996.

Defendant, represented by counsel, filed the present habeas petition on April 23, 1997. The petition raises two contentions, both of which were rejected on the merits when presented to the state courts in section 440.10 motions and subsequent appeals. First, defendant argues that the "prosecutor improperly elicited false testimony from the main prosecution witness, although he knew or should have known that the testimony was false." Pet. for Writ of Habeas Corpus at 3. Second, he argues that he was "denied effective assistance of counsel by his trial attorney's failure to expose the false prosecution evidence and to present affirmative exculpatory evidence regarding the nature of the crime scene." *Id.* at 4. He also argues that his state appellate counsel was ineffective.

IV. Law

A. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Under the "contrary to" clause, "a federal habeas court may grant the writ if the

state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495.

A person in custody pursuant to a state court judgment has one year in which to file an application for a writ of habeas corpus. *See* 28 U.S.C. § 2244(d)(1). Prisoners whose convictions became final before the effective date of AEDPA, April 24, 1996, had a grace period of one year, until April 24, 1997, to file their habeas application. *See Ross v. Artuz,* 150 F.3d 97, 103 (2d Cir.1998). Defendant, whose conviction became final before the effective date of AEDPA, filed his habeas corpus petition on April 23, 1997. The present petition is timely under the rule of *Ross,* as respondents properly concede. *See* Tr. of Hr'g of Mar. 20, 2003, at 2.

B. Ineffective Assistance of Counsel

1. Generally

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added). The Supreme Court has explained that in giv-

ing meaning to this requirement we must be guided by its purpose—"to ensure a fair trial"—and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, 104 S.Ct. 2052, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. *See also United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002).

A "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Purdy v. Zeldes,* —— F.3d ——, ——, 2003 WL 253144, at *6 (2d Cir.2003) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski,* 321 F.3d 110, 114 (2d Cir.2003). Although there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," the court must keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."

*Strickland,* 466 U.S. at 689, 696, 104 S.Ct. 2052.

2. Strategic Choices and Duty to Investigate

■ As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. 2052. Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. Where the nature of the crime scene is material to the defense, counsel may be deemed ineffective for having failed to investigate it properly. *See, e.g., Williams v. Washington,* 59 F.3d 673, 680–81 (7th Cir.1995) (ineffective assistance in part for failure to investigate crime scene where doing so would have revealed evidence that, "given the layout of the home and the relatively crowded conditions, the alleged assault could not have taken place as claimed" (quotation omitted)); *People v. Donovan,* 184 A.D.2d 654, 655, 585 N.Y.S.2d 70 (N.Y.App.Div.1992) (ineffective assistance where counsel failed "to dispatch an investigator to the scene [of defendant's arrest] ... until after the trial had commenced," leaving him "unprepared to effectively argue [the issue] before the court").

The court of appeals for the Second Circuit has recently implied that all of counsel's significant trial decisions must be justified by a sound strategy—a significant raising of the bar that arguably requires an unrealistic degree of perfection in counsel. *See Eze,* 321 F.3d at 136 (remanding to district court for factual hearing be-

cause it was "unable to assess with confidence whether strategic considerations accounted for . . . counsel's decisions").

## C. Prosecutorial Misconduct Relating to False Testimony

 A prosecutor may not knowingly allow a witness to give perjured testimony. *See United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair. . . ."). The same prosecutorial duty applies where the witness's testimony is simply false rather than perjurious. *See, e.g., United States v. Boyd,* 55 F.3d 239, 243 (7th Cir.1995) ("The wrong of knowing use by prosecutors of perjured testimony is different, and misnamed—it is knowing use of *false* testimony. It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false."); *United States v. Iverson,* 637 F.2d 799, 805 n. 19 (D.C.Cir.1980); *see also* 5 Wayne R. LeFave, et al., Criminal Procedure 497 (1999) ("As lower courts have noted, it matters not whether the witness giving false testimony was mistaken or intentionally lying. If the prosecution knows that the witness's statement is untrue, it has a duty to correct it."). Misconduct may also occur where a prosecutor knowingly presents ambiguous evidence to the jury in a misleading manner. *See Hamric v. Bailey,* 386 F.2d 390, 394 (4th Cir.1967) (prosecutorial misconduct occurs "not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact").

 Where a conviction is achieved with the aid of testimony that the prosecution knew or should have known to be false, it "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392. A successful challenge to a conviction based on the grounds of prosecutorial misconduct therefore requires the defendant to show that "(1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *United States v. Helmsley,* 985 F.2d 1202, 1205–06 (2d Cir.1993) (quoting *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392).

 In general such challenges to convictions based upon false testimony are subject to a due diligence requirement on the part of defendant. As the court of appeals for the Second Circuit has explained in the analogous situation of a petition for a writ of habeas corpus seeking relief from federal custody, "[normally] the requirement that a collateral attack must be supported by evidence not available by reasonable diligence at trial applies to claims of a prosecutor's knowing use of false testimony." *Helmsley,* 985 F.2d at 1206. A limited exception to this rule exists where defendant claims the prosecutor was both aware of the falsity of the witness's statements and was "directly involved as a participant" in the transaction about which the witness was untruthful. *Id.* at 1207 (citing, as examples, a prosecutor's knowledge that a witness had falsely denied a plea deal because the prosecutor had made the deal with the witness; a prosecutor's knowledge that grand jury witnesses had testified contrary to the prosecutor's representations at trial because the prosecutor had elicited their grand jury testimony; and a prosecutor's knowledge that a witness at trial had falsely denied having testified before a grand jury because the prosecutor had called her as a witness at the grand jury). Stated succinctly, the court of appeals has

never permitted a successful collateral attack for a prosecutor's knowing use of false testimony based entirely on evidence of which the defendant was aware, or in the exercise of reasonable diligence should have been aware, at trial, and [the court has] permitted such an attack to succeed, despite the existence at trial of some basis for the defendant to suspect the prosecutor's knowing use of false testimony, only where the prosecutor was directly involved in the falsity.

*Id.* at 1208.

V. Application of Law to Facts

A. Ineffective Assistance of Counsel

■ Artis's testimony that she observed defendant at a second floor apartment on the rear fire escape of the victim's building at the time of the murder, along with her testimony that there was only one fire escape at the back of the apartment building, was not the only evidence of defendant's guilt. Other evidence included the blood stains on his sneakers and his construction of a false alibi. The Artis testimony was, however, of overwhelming importance for the prosecution's case. Without this testimony it is doubtful that there would have been enough evidence to permit a jury verdict.

Relying upon Artis's statements, the prosecution was able to argue that defendant was seen at the window of the victim's apartment just before the murder, attempting to gain access to the apartment. The evidence dovetailed with the prosecution's theory of the case, which relied upon the fact that the door and all windows to the victim's apartment—save for that of the fire escape—were locked, and that the murderer likely entered and exited through the victim's fire escape window.

If defense counsel had made a proper investigation prior to trial—or if he had paid sufficient attention to the police reports that were turned over to him as *Rosario* material—he would have been able to deal significant blows to the prosecution's case in several ways. First, and most important, counsel would have eliminated all proof that defendant was seen that evening outside of the victim's window. It cannot be gainsaid that testimony placing defendant on a fire escape directly outside of the victim's apartment is decidedly more inculpatory than testimony that does no more than place defendant in a location elsewhere at the victim's building.

Second, with knowledge of the layout of the apartment buildings and their fire escapes, counsel could have argued that the witness, in identifying defendant as the man she saw on the fire escape, likely made an improper intuitive leap and jumped to the conclusion that she had seen defendant when in fact she had seen someone else. Counsel, that is, might well have argued that the witness—who was repeatedly shown a picture of the defendant by police and recognized defendant from having previously seen him enter the victim's building—may simply have assumed that the man she saw on the fire escape was in fact the defendant. Such an argument by defense counsel might have been particularly effective given that the witness had initially failed to identify defendant, that she was in jail at the time of trial and testifying pursuant to a plea agreement, and that her credibility—at least in the eyes of the trial judge—"leaves something to be desired." Pretrial Hr'g at 257.

Finally, if properly armed with the easily discoverable facts concerning the layout of the victim's apartment building, counsel would likely have chosen to highlight the implausibility of the prosecution's theory of the crime. Why, counsel would have asked, would defendant have been at the window of another resident's apartment

when his plan all along was to murder his girlfriend in another apartment? Why would defendant have spent fifteen to twenty minutes—as Artis testified at the pretrial hearing—"messing with" the window of another apartment? *Id.* at 41.

The prosecutor urges that defense counsel's failure to investigate did not, at any rate, prejudice defendant because the prosecution could have argued at trial that defendant climbed up one fire escape, ran across the roof and then descended another fire escape in order to reach the victim's apartment. This alternative theory of defendant's actions might be sufficiently plausible to sway a jury to convict him, but the theory was never presented to a jury or subjected to adversarial testing by defense counsel. The theory is not so compelling as to merit the conclusion that, but for defense counsel's ineffective performance, there is no reasonable probability that the jury would have reached a different result.

Defense counsel, in an affidavit submitted in response to defendant's motion to vacate judgment, seeks to excuse his failure to investigate the crime scene. He claims primarily that defendant assured him that Artis's testimony concerning the layout of the apartment buildings was accurate. Setting aside the fact that defendant altogether denies that he gave counsel such assurances, under the circumstances of the present case it was unreasonable for either counsel—or a factotum such as a paralegal or investigator—to have failed to conduct any investigation whatsoever of the crime scene. Charged with second-degree murder, defendant was facing what was at the time the harshest penalty possible under New York law, and the case against him hinged crucially on the testimony of one eyewitness. That circumstance alone should have been enough to put counsel on notice that he had an obligation to see for himself what the crime scene looked like. At the very least counsel should have taken a subway ride to the witness's building in order to ascertain for himself whether the witness could really have seen the apartment in question through the bars and frosted glass that, as she explained at the pretrial hearing, covered much of the window through which she see purportedly saw defendant.

Counsel's failure to visit the scene himself or by an investigator is even more stunning in view of the trial court's observation at the pretrial hearing that the layout of the buildings was "important" and that "it would be very helpful if we had some kind of a diagram here, because it's impossible to really understand what the visual situation was like." Pretrial Hr'g at 78, 94. Given the gravity of the charges and the reasonable possibility that an investigation might have undermined pivotal testimony to be presented by the prosecution, it was a dereliction for defense counsel to rely on the assurances of a defendant who, as a layman, may or may not have understood the critical nature of the layout of the buildings.

There are costs involved whenever defense counsel is obliged to undertake an investigation. These costs are often substantial. The time which counsel must devote to visiting the crime scene represents at the very least a lost opportunity cost for an private attorney, preventing him or her from generating other income to support his or her practice. Hiring an investigator in lieu of visiting the scene himself or herself also requires a financial outlay. What is counsel to do if defendant is unwilling or unable to finance even a rudimentary investigation?

Lawyering is a business. It has entrepreneurial and commercial demands. *See Jelinek,* at 280–81.

■ Having accepted the responsibility of representing a criminal defendant, counsel owes a duty to his client that will on occasion require him to make financial outlays that might be considered unfair for an ordinary businessman who, unlike a licensed attorney, has not voluntarily adopted an enhanced ethical obligation to society. It is, in a word, not unfair to lay upon a lawyer the duty to perform a rudimentary inspection of a crime scene on behalf of a defendant in a murder case where such an inspection might reasonably yield tangible benefits to the defense.

■ In the present case, counsel stated to the district attorney's office that he did not believe defendant's family would have agreed to hire an investigator due to financial constraints. This explanation fails to excuse counsel's failure to investigate for several reasons. First, counsel concedes that he never actually consulted with either his client or his client's family about whether they could or would pay the fees associated with hiring an investigator to look over the crime scene. Had counsel explained to his client how crucial such an investigation might have been to the defense case, it seems likely that defendant's family, at the least, would have found a way in which to pay for an investigator. Although concededly an ex post assertion, defendant's sister now claims that the family would certainly have found the economic resources to do so. Counsel's failure to inquire of his client with respect to this important matter speaks to his incompetent representation in this regard.

Second, counsel did not apply to the trial court for money to pay for an investigator, even though defendant might have been entitled to funds from the county. Under New York law,

> Upon a finding in an ex parte proceeding that investigative, expert or other services are necessary and that the defendant ... is unable to obtain them, the court shall authorize counsel, whether or not assigned in accordance with a plan [pursuant to New York County Law section 722], to obtain the services on behalf of the defendant or such other person.

N.Y. County Law § 722–c. In the absence of guidance from New York's higher courts, it is unclear whether section 722–c funds would have been available for an indigent defendant who has retained counsel. In *People v. Powell*, for instance, a New York county court concluded that funds for a defendant with retained counsel were not authorized by the statute:

> Defendant apparently construes this latter phrase [*i.e.*, "counsel, whether or not assigned in accordance with a plan,"] to include retained counsel where it is claimed at the time of application to the court that defendant is indigent and cannot obtain other needed services. It is this court's opinion that such is not the construction or meaning of such a provision. The entire history of the statute relates to indigent defendants and section 722–c was enacted to provide an indigent defendant with services, in addition to those of counsel, which previously had been unavailable to an indigent defendant. As state by the court in [*People v. Baker*], "There certainly was no intent to provide carte blanche to the County Treasury."

101 Misc.2d 315, 420 N.Y.S.2d 968, 969 (1979) (citation omitted). Nonetheless, it is not at all clear that funds would have been· denied to defendant if requested by counsel. Another New York court has opined that although services "compensated pursuant to County Law section 722–c are a charge against the municipality in question and constitute a use of precious governmental funds," nonetheless "this cannot be the overriding concern when the ability of the court to carry out its essen-

tial function of assuring justice and due process is implicated." *In re Director of the Assigned Counsel Plan,* 159 Misc.2d 109, 603 N.Y.S.2d 676, 685 (1993). Given the paucity of case law on the subject and the apparent plain meaning of the statutory language, counsel in the present case should at least have moved the trial court for funds pursuant to section 722–c rather than abandon altogether the investigation.

Finally, even if no funds were forthcoming either from the defendant, defendant's family or the county, counsel still had a professional, ethical obligation to conduct the investigation himself. This is not a circumstance in which the investigation would have been unduly expensive and time consuming. No plane flights were necessary, no technical, medical or psychiatric experts were required. A simple subway or taxi ride to the crime scene and the expenditure of several hours of investigation were all that would be minimally necessary. It is admittedly somewhat unpalatable to the court to lay responsibility for the expense of such an investigation on defense counsel where the government itself refuses to acknowledge its responsibility to make funds available in order to achieve a fair trial. In this court, such funds would be made available in such a case. The financial obligation should in the end, in all fairness, rest with society. Nonetheless, even if county funds were not available, once counsel accepted defendant as a client it became his duty to perform a competent investigation on his behalf.

In sum, by failing to conduct an investigation of the crime scene under the circumstances of the instant case, counsel's performance fell below an objective standard of reasonableness measured under prevailing professional norms. There was no strategic rationale for failing to perform such an investigation, nor would there have been any tactical advantage in not using at trial the information that would have been gathered in such an investiga-

tion. Particularly given that the verdict was not overwhelmingly supported by the record, there is more than a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different. The Appellate Division's conclusion otherwise is, respectfully, an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States in *Strickland v. Washington.*

### B. Prosecutorial Misconduct

■ Habeas relief is not warranted with respect to defendant's other claim— that the prosecutor engaged in misconduct by eliciting and exploiting false testimony from witness Artis. Her testimony, that she observed defendant on the only fire escape affixed to the back of the victim's apartment building, was not accurate. In fact, the building has three fire escapes— one at the front, one at the back, and one at the side—and the fire escape upon which she observed an intruder was attached to the side rather than the rear of the victim's building. Artis's testimony was not perjurious; though her testimony concerning the layout of the building was false, it was not knowingly false.

The Appellate Division, when presented with the claim of prosecutorial misconduct, concluded that "there was no deliberate attempt by the prosecutor to submit the case to the jury based upon proof which he knew or should have known to be false." *Thomas,* 226 A.D.2d at 485, 641 N.Y.S.2d 48. There is no compelling evidence that the prosecutor knowingly made use of Artis's inaccurate testimony. It is a closer question whether he should have known the testimony to be false. Inspection of the police reports alone should have indicated to the prosecutor (as it should have to defense counsel) that the witness's testimony was so inaccurate as to be mislead-

ing. In addition, it is reasonable to expect the prosecution in a second-degree murder case to have had a more comprehensive understanding of the crime scene. It is quite probable, therefore, that the prosecution should have known that the witness's testimony was inaccurate. But even accepting that the prosecutor should have known that Artis's testimony was misleading and false, habeas relief on this ground alone would not have been warranted under the present circumstances.

If the prosecution had failed to turn over to defendant the police reports indicating that Artis's testimony was misleading, then defendant's conviction would in all likelihood require reversal, regardless of whether the prosecutor had actual knowledge of the content of the police reports. *See Kyles v. Whitley,* 514 U.S. 419, 421, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (knowledge of exculpatory information possessed by the police is imputed to the prosecutor). That is not the situation here. The police reports were turned over to defendant, and his counsel had ample opportunity to glean from the reports the crucial information. There is no allegation that defense counsel was in any way impeded from visiting the crime scene. Where, as here, the prosecutor did not knowingly utilize false testimony and did not withhold from the defense the foundational evidence that would demonstrate the falseness of the witness's testimony, the burden lies on defense counsel rather than the prosecutor to call the jury's attention to the relevant exculpatory evidence. To hold otherwise would be to require the prosecution to take on duties that are properly in the domain of defense counsel.

## VI. Conclusion

The petition for a writ of habeas corpus is granted.

Petitioner shall be released from respondent's custody unless appropriate steps are taken for a retrial within 120 days of the date of the previous judgment in this matter, March 20, 2003. This order is stayed pending completion of any appeal.

SO ORDERED.